MANDOLI *v.* ACHESON, SECRETARY OF STATE.

No. 15.  Argued October 17, 1952.—Decided November 24, 1952.

*Jack Wasserman* argued the cause for petitioner. With him on the brief were *Gaspare Cusumano* and *Harry Meisel.*

*Oscar H. Davis* argued the cause for respondent. With him on the brief were *Acting Solicitor General Stern, Assistant Attorney General Murray, Beatrice Rosenberg* and *John R. Wilkins.*

MR. JUSTICE JACKSON delivered the opinion of the Court.

This case presents but a single question, upon which petitioner and the Government are substantially agreed that the judgment of the Court of Appeals should be reversed.[1] Does a United States citizen by birth who by foreign law derives from his parents citizenship of a foreign nation lose his United States citizenship by foreign residence long continued after attaining his majority?

Petitioner Mandoli was born in this country, of unnaturalized Italian parents. These circumstances made him a citizen of the United States by virtue of our Constitution and a national of Italy by virtue of Italian law. While he was a suckling, his parents returned to Italy taking him with them. At about the age of fifteen, he sought to come to the United States; but permission was refused by the American Consul at Palermo upon the ground that he was too young to take the journey unaccompanied.

In 1931, Mandoli saw brief service in the Italian army. In 1937, being 29 or 30 years of age, he attempted to come to the United States, but was rejected because of such army service. He renewed the effort in 1944, with the same result. In 1948, he was granted a certificate of identity which permitted him to enter the United

---

[1] Certiorari was granted without opposition, 343 U. S. 976.

States for prosecution of an action to establish his citizenship.

Judgment in the District Court went against him on the ground that expatriation had resulted from two causes: first, contrary to his contentions, it found that his service in the Italian army was voluntary and that he then took an oath of allegiance to the King of Italy; second, that he continued to reside in Italy after attaining his majority, thereby electing between his dual citizenships in favor of that of Italy.[2]

The Government abandoned the first ground because the Attorney General ruled that such service in the Italian army by one similarly situated could "only be regarded as having been taken under legal compulsion amounting to duress." He said, "The choice of taking the oath or violating the law was, for a soldier in the army of Fascist Italy, no choice at all."[3] The Court of Appeals, however, relying largely on *Perkins* v. *Elg,* 307 U. S. 325, affirmed upon the ground that failure to return to the United States upon the attainment of his majority operated to extinguish petitioner's American citizenship.[4] We conclude that Mandoli has not lost his citizenship.

It would be as easy as it would be unrewarding to point out conflict in precept and confusion in practice on this side of the Atlantic, where ideas of nationality and expatriation were in ferment during the whole Nineteenth Century. Reception of the common law confronted American courts with a doctrine that a national allegiance into which one was born could be renounced only with consent of his sovereign. European rulers, losing subjects (particularly seamen) to the New World, adhered fiercely to the old doctrine. On the other hand, the

[2] D. C. opinion not reported.
[3] 41 Op. Atty. Gen., Op. No. 16.
[4] 90 U. S. App. D. C. 1121, 193 F. 2d 920.

United States, prospering from the migrant's freedom of choice, became champion of the individual's right to expatriate himself, for which it contended in diplomacy and fought by land and by sea. However, this personal freedom of expatriation was not always recognized by our own courts, because of their deference to common-law precedent. Finally, Congress, by the Act of July 27, 1868, declared that "the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness" and that "any declaration, instruction, opinion, order, or decision of any officers of this government which denies, restricts, impairs, or questions the right of expatriation, is hereby declared inconsistent with the fundamental principles of this government." [5]

But this statute left unanswered many questions as to the overt acts that would effect a voluntary expatriation by our own citizens or would cause an involuntary forfeiture of citizenship. Prior to 1907, courts and administrators were left to devise their own answers.

Preparatory to legislative action on the subject, Congress sought and received a report of a special citizenship board. Reviewing judicial decisions, this report concluded that the courts recognized well-established doctrines of election in cases dealing with rights of persons with dual citizenship. This board recommended that Congress follow what it assumed to be established decisional law and enact, among other things, that expatriation be assumed as to any citizen who became domiciled in a foreign state, with a rebuttable presumption of foreign domicile from five years of residence in a foreign state.[6] This was proposed as to all citizens and not

---

[5] 15 Stat. 223, 8 U. S. C. § 800.

[6] H. R. Doc. No. 326, 59th Cong., 2d Sess., p. 23; see also 74, 79, 160 *et seq.*

merely those possessing dual citizenship. Congress, however, instead of accepting this broad doctrine of expatriation, by the Expatriation Act of 1907 limited the presumption of expatriation from foreign residence to the case of naturalized but not of native-born citizens.[7]

If petitioner, when he became of full age in 1928, were under a statutory duty to make an election and to return to this country for permanent residence if he elected United States citizenship, that duty must result from the 1907 Act then applicable. In the light of the foregoing history, we can find no such obligation imposed by that Act; indeed, it would appear that the proposal to impose that duty was deliberately rejected.[8]

The Nationality Act of 1940,[9] though not controlling here, shows the consistency of congressional policy not to subject a citizen by birth to the burden and hazard of election at majority. This comprehensive revision and codification of the laws relating to citizenship and nationality was prepared at the request of Congress by the Departments of State, Justice and Labor. The State Department proposed a new provision requiring an American-born national taken during minority to the country of his other nationality to make an election and to return to the United States, if he elected American nationality, on reaching majority. The Departments of Justice and Labor were opposed and, as a consequence, it was omitted from the proposed bill. This disagreement between the Departments was called to the attention of the Con-

---

[7] 34 Stat. 1228.

[8] Administrative practice, when involving protections abroad, involves very different policy considerations and is not controlling here. However, while not always consistent, it seems to have settled to the rule we apply in this case. 3 Hackworth, Digest of International Law, 371; see also Nielsen, Some Vexatious Questions Relating to Nationality, 20 Col. L. Rev. 840, 854.

[9] 8 U. S. C., c. 11.

gress.[10]  While in some other respects Congress enlarged
the grounds for loss of nationality, it refused to require
a citizen by nativity to elect between dual citizenships
upon reaching a majority.[11]

The Court of Appeals, however, applied such a rule
because it understood that this Court, in *Perkins* v. *Elg,
supra,* had declared it to be the law.   Miss Elg was Amer-
ican-born, of naturalized parents Swedish in origin.   They
took her to Sweden when she was but four years old, where
she remained during her nonage.   By virtue of a Swedish-
American Treaty of 1869, this resumption of residence in
Sweden repatriated the parents, which carried with it
Swedish citizenship for their minor child.   Under the Act
of 1907, any American citizen is deemed expatriated if
naturalized in a foreign state in conformity with its laws.
Undoubtedly, Miss Elg had become naturalized under the
laws of Sweden.   But it was not by any act of her own
or within her control, and about eight months after she
became twenty-one, she sought and obtained an American
passport and returned to this country where she resided
for something over five years.   American immigration
officials then decided that her derivative naturalization
had deprived her of American citizenship and put their
harsh and technical doctrine to test by instituting pro-
ceedings to deport her.   That case did not present and the
Court could not properly have decided any question as to
consequences of a failure to elect American citizenship,
for Miss Elg promptly did so elect and decisively evi-
denced it by resuming residence here.   What it held was
that citizenship conferred by our Constitution upon a
child born under its protection cannot be forfeited because

---

[10] See Hearings before House of Representatives Committee on Im-
migration and Naturalization on H. R. 9980, 76th Cong., 1st Sess.,
p. 32.

[11] See also § 350 of Pub. L. No. 414, 82d Cong., 2d Sess., 66 Stat.
163, 269.

the citizen during nonage is a passive beneficiary of foreign naturalization proceedings. It held that Miss Elg had acquired a derivative dual-citizenship but had not suffered a derivative expatriation. In affirming her right to return to and remain in this country, it did not hold that it was mandatory for her to do so.

We find no warrant in the statutes for concluding that petitioner has suffered expatriation. And, since Congress has prescribed a law for this situation, we think the dignity of citizenship which the Constitution confers as a birthright upon every person born within its protection is not to be withdrawn or extinguished by the courts except pursuant to a clear statutory mandate.[12] The judgment of the Court of Appeals should be reversed, with directions to remand the case to the District Court for the entry of an order declaring that the petitioner is a citizen of the United States.

*Reversed and so ordered.*

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE, MR. JUSTICE REED, and MR. JUSTICE CLARK concur, dissenting.

At the times relevant here Congress made the taking of "an oath of allegiance to any foreign state" the ground for loss of American citizenship. 34 Stat. 1228, 8 U. S. C. § 17. The findings of the District Court in this case state that "On May 24, 1931, the plaintiff took an oath of allegiance to the King of Italy." That finding is uncontroverted here and the precise circumstances surrounding the taking of the oath are unexplained. All we know is that plaintiff, without protest, was inducted into the

---

[12] The question of whether the statutory grounds under the 1940 Act exclude other acts that will amount to voluntary expatriation was reserved in *Kawakita* v. *United States*, 343 U. S. 717, 730–732. It is not present in this case.

Italian Army and served there from April 14, 1931, to September 5, 1931.

If we are to base our decision on the record, we would be compelled to affirm. For it is plain that petitioner did take an oath of allegiance to a foreign state. The Court, however, ignores the record and rests on an opinion of the Attorney General in another case (cf. MR. JUSTICE JACKSON concurring, *McGrath* v. *Kristensen,* 340 U. S. 162, 176), saying that one who took an oath in the Army of Fascist Italy did so under duress. We have no basis for knowing that every inducted soldier who took an oath in Mussolini's army did so under duress. For all we know, this American citizen took the oath freely and gladly. At least, he took it. If we acted in the role of Secretary of State or Attorney General, we might exercise our discretion in favor of the citizen and decide not to move against him on such a showing. But we sit not as cabinet officers but as judges to decide cases on the facts of the records before us.