## GAUDIO v. DULLES, Secretary of State.

### Civ. A. No. 1356–51.

United States District Court
District of Columbia.
Feb. 19, 1953.

2. Forbes v. United States, 5 Cir., 268 F. 273; Zug v. City of Pittsburgh, 194 Pa. 367, 370, 45 A. 61.

the plaintiff is a citizen of the United States under the facts at hand.

Plaintiff was born in New Haven, Connecticut, on December 24, 1916, of naturalized Italian parents. In September, 1921, she was taken to Italy by her parents and there resided continuously until October 19, 1951, when she was permitted to come to the United States on a certificate of identity to prosecute this case. Testimony by the plaintiff reveals she was issued a passport to the United States in 1937. However, she explains she was unable to leave Italy at that time because of illness suffered by her son and herself. No attempt to return to the United States was made again until June 27, 1947, when the American Consul refused an application for repatriation, because of prolonged residence abroad. Plaintiff accounts for her failure to pursue the necessary procedural steps to retain her American citizenship during this interim period on the grounds that a state of war existed in Italy from 1941 until early part of 1946; and further that war-torn roads and poor transportation prevented her from communicating with the American consulate in Naples, 70 miles away. Plaintiff married an Italian national in 1935 and two children were born of the marriage. The husband remains in Italy, although both children have taken up permanent residence in this country under an American passport issued in Italy.

The Government takes the position that the plaintiff became a dual national *after* birth by reason of the parents returning to Italy and becoming nationals of their native land. This premise established, the Government concludes that plaintiff was under an obligation to return to the United States prior to January 13, 1943, if she desired to retain her American citizenship. Section 401(a) of the Nationality Act of 1940.[1]

Joseph Lyman, Washington, D. C., for plaintiff.

Charles M. Irelan, U. S. Atty., and Robert Scott, Asst. U. S. Atty., Washington, D. C., for defendant.

KIRKLAND, District Judge.

A declaratory judgment is sought in this suit for the purpose of establishing whether

1. Section 401(a) of the Nationality Act of 1940, 8 U.S.C.A. § 801(a), reads as follows:

"A person who is a *NATIONAL* of the United States, whether by birth or naturalization, *SHALL LOSE HIS NATIONALITY* by:

"(a) Obtaining naturalization in a foreign state, either upon his own application or

*THROUGH THE NATURALIZATION OF A PARENT HAVING LEGAL CUSTODY OF SUCH PERSON:* Provided, however, That nationality *SHALL NOT BE LOST* as the result of the naturalization of a parent unless and *UNTIL THE CHILD SHALL HAVE ATTAINED THE AGE OF TWENTY-THREE YEARS WITHOUT ACQUIRING PER-*

708

A child at birth or by reason of his parents' subsequent acts may become the object of a double-claim of allegiance due to the fact that Nations may rely on *jus soli* (nationality by place of birth), *jus sanguinis* (nationality by blood) and naturalization laws (nationality of another nation acquired as a result of the parent becoming naturalized therein while having legal custody of the child). This double allegiance has been an issue of concern to the United States Congress for many decades. Nor has the hardship, of possible loss of American citizenship by a native-born American citizen through no overt act of his own, passed unnoticed. See extensive hearings on this topic in Hearings before the Committee on Immigration and Naturalization, House of Representatives, Seventy-Sixth Congress, First Session on H.R. 6127 superseded by H.R. 9980. It was this element of unfairness, on the one-hand, as compared to the need of ascertaining those to be protected under the cloak of American citizenship on the other hand, that caused the Congress to enact the above quoted section.

The terms of Section 401(a) appear in clear and relatively simple language. There appears to be no ambiguity and the plain meaning of the provision would seem to dispense with any need to enter the realm of conjecture. It has long been a rule of interpretation that where the Legislature has spoken in clear and unequivocal language the courts are bound thereby. Wall v. Pfanschmidt, 1914, 265 Ill. 180, 106 N.E. 785, L.R.A.1915C, 328. However, the instance is not rare when courts have found ambiguity existing in unambiguous statutes.

24 Minn. L.R. 509–513 (1940). Hard cases, with sympathizing facts, usually make bad law. Under such circumstances, courts have unduly strained at the language of a statute.

Section 401 enumerates the many ways a person may lose his American citizenship. It was meant to apply to all nationals of the United States, whether by birth or naturalization. Originally, subsection (a) would have permitted the loss of citizenship when a person was naturalized, "either upon his own application or through the naturalization of a parent having legal custody of such person". However, the Congress was made aware that as the bill stood it would have strong opposition. Hearings before House of Representatives Committee on Immigration and Naturalization on H.R. 6127 superseded by H.R. 9980, 76th Congress, 1st Session, page 130. Accordingly, Congress adopted two provisos. The first proviso was submitted by the Department of State, and both the Department of Labor and Department of Justice were in accord with its substance. Hearings, Id., p. 158–161.

By the adoption of this proposal, Congress made an exception to the general proposition offered under Section 401(a), and granted dual nationals, whether by birth or naturalization, the opportunity to elect within two years after reaching majority the country to which they choose to pledge allegiance. This permitted a native-born American citizen, with dual nationality, who faced losing his American citizenship by no overt act of his own, the opportunity to retain his citizenship in this country.[2] The second proviso did stir up some conflict

MANENT RESIDENCE IN THE UNITED STATES: Provided further, That a person who has acquired foreign nationality through the naturalization of his parent or parents, and who at the same time is a citizen of the United States, SHALL, IF ABROAD and he has not heretofore expatriated himself as an American citizen by his own voluntary act, BE PERMITTED WITHIN TWO YEARS FROM THE EFFECTIVE DATE OF THIS CHAPTER TO RETURN TO THE UNITED STATES AND TAKE UP PERMANENT RESIDENCE THEREIN, and it shall be thereafter

deemed that he has elected to be an American citizen. FAILURE on the part of such person TO SO RETURN AND TAKE UP PERMANENT RESIDENCE IN THE UNITED STATES during such period SHALL BE DEEMED to be a DETERMINATION on the part of such person TO DISCONTINUE HIS STATUS AS AN AMERICAN CITIZEN, and such person shall be FOREVER ESTOPPED by such failure from thereafter CLAIMING SUCH AMERICAN CITIZENSHIP". (Italics-capitals supplied.)

2. Rep. Poage (Texas): " * * * (I) don't see why anybody who does not live

of views between the Department of State and the Departments of Labor and Justice. The Department of State argued that those dual nationals who had reached the age of majority years ago and had remained abroad should be regarded as having made their choice to give up their claim to American citizenship. The Department of Labor sought to be compassionate, and forwarded the observation that it would be grossly unfair to suddenly close the door on those dual nationals abroad who, in good faith, held themselves out to be Americans. They voiced the suggestion that such persons be awarded a final opportunity to return to this country and assert themselves. The period of two years from the date of the passage of the Act, being considered, was looked upon as a reasonable time within which these persons should come forth or forever be estopped from claiming American citizenship. After lengthy consideration, the Department of Labor's submitted proposal was adopted verbatim. Hearings, Id. p. 254.

within the United States and who does not have the opportunity to take part in American Institutions, who does not have the opportunity to grow up to be what we look upon as an American and to speak the English language, who doesn't have any contact with our form of government—I don't see why that person, no matter what their birth, what their lineage, I don't see why we should confer citizenship upon them, no matter whether both their parents are American citizens by statute."

 *       *       *       *       *

"My observation is that these people have gotten awfully patriotic along about the time that they have had trouble abroad. They rush to the State Department, waving the American flag in one hand and holding out the other to be pulled into the United States, just as soon as there is trouble. But as long as it is a matter of making money outside the United States, and as long as they do not need Uncle Sam's protection they don't have any great interest in what is going on over here. * * *" Hearings, Id. p. 48.

Rep. Mason (Ill.): "We want to end this dual citizenship after 2 years' time once and forever."

Rep. Dickstein, Chairman, (N.Y.): "I have the highest regard for the opin-

It was, and still is, the intention that the plague of "dual nationality" be eliminated to every degree possible. This is evidenced by the recent passage of the McCarran-Walters Act. Preliminarily in the report accompanying H.R. 5678 (McCarran-Walters) to the House floor there appeared this language:

"The problem of dual nationality is one of the most difficult in the nationality law. It is possible in some instances for a *native-born* American citizen to have dual nationality, and in many cases if the dual national is taken by his parents to the country which also claims him as a national he might under other provisions of the nationality law lose his American nationality through no overt act of his own." (Report No. 1365, 82d. Congress—2d, Session, p. 87.)

Consideration and solution of the thorny problem was attempted by passage of a provision similar to section 401(a) of the Nationality Act of 1940.[3] Again, in 1952,

ion of the Department of State, and I think it is very important for the safety of the country to terminate this dual citizenship." Hearings, Id. p. 320.

3. "From and after the effective date of this act a person who is a *NATIONAL OF THE UNITED STATES* whether *BY BIRTH* or naturalization, *SHALL LOSE* his *NATIONALITY* by—

"(1) obtaining naturalization in a foreign state upon his own application, upon an application filed in his behalf by a parent, guardian, or duly authorized agent, or *THROUGH THE NATURALIZATION OF A PARENT HAVING LEGAL CUSTODY* of such person: *PROVIDED,* That *NATIONALITY SHALL NOT BE LOST* by any person under this section *AS THE RESULT OF THE NATURALIZATION OF A PARENT* or parents *WHILE SUCH PERSON IS UNDER THE AGE OF TWENTY-ONE YEARS,* or as the result of a naturalization obtained on behalf of a person under twenty-one years of age by a parent, guardian, or duly authorized agent, *UNLESS* such person *SHALL FAIL TO ENTER THE UNITED STATES* to establish a permanent residence *PRIOR TO HIS TWENTY-FIFTH BIRTHDAY:* And *PROVIDED FURTHER,* That a *PERSON WHO SHALL HAVE LOST NATIONALITY*

and in deliberate and very clear terms, the opportunity has been extended to dual nationals to return to the United States as American citizens, providing they make an election within a specified time period. The provisions of re-entry add that those over the age of 25 years shall be admitted as *nonquota* immigrants; this should be conclusive of the present intent of Congress.

However, this case is controlled by the Nationality Act of 1940, and under that Act the plaintiff failed to return to the United State within the period of grace set forth. Section 401(a) extended the right to dual nationals, who had not voluntarily expatriated themselves, to return to the United States by January 13, 1943. Thereafter, such persons were to be "forever estopped" from claiming American citizenship. Plaintiff explains the war intervened and the American Consulate in Naples was closed from 1941 until 1946; that as a result it was impossible to return to the United States by January 13, 1943. The inevitable suggestion to be derived from such testimony is that the Act was in a temporary state of suspension during those years. A like defense was offered in the case of Mastrocola v. Acheson, D.C., 105 F.Supp. 580, 582, and the court held such claim was without merit in that legislative records indicated that the statute did not toll.[4] In support of this position, note is taken of the Congressional attitude when an occasion to alleviate this result was offered. H.R. 387, 79th Congress, 1st Session, was introduced for the purpose of extending the deadline of January 13, 1943, to January 13, 1947. The Committee on Immigration and Naturalization reported favorably on the bill and recommended it be enacted but still the House of Representatives refused to pass it.

■ ■ During the periods prior to 1947 when the American Consulate in Naples was open, plaintiff claims she could not contact them because of the interjacent impassable terrain. Her testimony left the impression that the village where she resided was completely severed and divorced from the rest of the world. This court is in doubt as to plaintiff's veracity as to these facts and, furthermore, does not feel the plaintiff displayed any sincere efforts to embrace United States citizenship until June of 1947. Prior to that date she seemingly was in a state of uncertainty as to where the pastures were greenest. Now, with the shadow of middle age approaching, she apparently feels the greatest benefits lie in American citizenship. The lure of social security and old age pensions attract many who have not contributed one iota of assistance to the well being of this country; they have not recognized their obligations as American citizens—rather they are only conscious of the advantages and rewards thereunder. If an adult person does not value his citizenship enough to come forth and affirmatively assert it, he is not worthy of it. Those individuals in the status of dual nationals have the duty to make an election within the reasonable time established by Congress, or accept the consequences of their passive attitude.

If this court were not bound by the rulings of the Supreme Court of the United States, and the Court of Appeals for the District of Columbia, it would not hesitate to render judgment against the plaintiff. This court would prefer to follow the doctrine announced in Mastrocola v. Acheson, N.Y., supra. However, since this is a trial court of the District of Columbia Circuit we are compelled to follow the deci-

PRIOR TO JANUARY 1, 1948, THROUGH THE NATURALIZATION in a foreign state of a parent or parents, may, within one year from the effective date of this act, *APPLY FOR A VISA AND FOR ADMISSION TO THE UNITED STATES AS A NON-QUOTA IMMIGRANT* under the provisions of section 101(a) (27) (E). (Section 349(a), Public Law 414, passed June 27, 1952.)" (Italics and capitals supplied.)

4. The court therein cited the Report of the Committee on the Judiciary Pursuant

to S.Res. 137, April 20, 1950, p. 748: "Unlike the period of time allowed in other sections of the act for the return of American nationals abroad, that period of time allowed those who lost their citizenship through their parents' naturalization in a foreign state to return to the United States was not extended after January 13, 1943. Consequently, all persons in this class who continued to reside abroad after that date are deemed to have elected against American citizenship and are at this time precluded from claiming it."

sions rendered by the Appellate Courts in this jurisdiction.

In Mandoli v. Acheson, 1952, 344 U.S. 133, 137, 73 S.Ct. 135, 137, the Supreme Court, although under no compulsion to do so, had this to say of the Nationality Act of 1940:

"The Nationality Act of 1940, though not controlling here, shows the consistency of congressional policy not to subject a citizen by birth to the burden and hazard of election at majority. This comprehensive revision and codification of the laws relating to citizenship and nationality was prepared at the request of Congress by the Departments of State, Justice and Labor. The State Department proposed a new provision requiring an American-born national taken during minority to the country of his other nationality to make an election and to return to the United States, if he elected American nationality, on reaching majority. The Departments of Justice and Labor were opposed and, as a consequence, it was omitted from the proposed bill. This disagreement between the Departments was called to the attention of the Congress. While in some other respects Congress enlarged the grounds for loss of nationality, it refused to require a citizen by nativity to elect between dual citizenships upon reaching a majority."

█ The Supreme Court erred in its legal premise; the State Department's proposal *was* accepted by Congress with only one modification: instead of an *immediate* election on reaching majority, the native-born dual national was to have *two* years, after the date of reaching majority, within which to make his choice of allegiance. Hearings, Id., p. 269-318. The State Department's proposal *is* quoted in the first proviso of Section 401(a) of the Nationality Act of 1940. Thus, the statement that "the consistency of congressional policy not to subject a citizen by birth to the burden and hazard of election at majority" is doubtful and apparently not supported by the Congressional record of the proceedings. See Hearings, Id. pp. 158–159, 176–180, 200, 249, 250, 267–8 and especially pp. 318–320. The Department of State did object to permitting those persons entry into the United States who had attained majority years ago and had continued to reside in the foreign country (Hearings, Id. pp. 248–249, 260, 266, 274); and in this regard, as previously stated, the Congress preferred to side with the Departments of Labor and Justice by inserting verbatim the second proviso of Section 401(a). Hearings, supra, Id., p. 254. The interpretation now resting on this provision has completely frustrated the Congressional intent to eliminate the vexing problem of "dual nationality". In Acheson v. Maenza, 92 U.S.App. D.C. ——, 202 F.2d 453, the United States Court of Appeals for the District of Columbia specifically adopted the Supreme Court's language pertaining to prolonged foreign residence by a dual national and held such residence "does not in itself deprive an American citizen of his citizenship rights". Reluctantly, this court is under compulsion to follow the conclusions of both appellate courts and accordingly, the plaintiff shall be adjudged an American citizen. Counsel will present an appropriate order.