**AUGELLO v. DULLES, Secretary of State of United States.**

No. C 7193.

United States District Court
E. D. New York.

March 6, 1953.

Harry Meisel, Washington, D. C., for plaintiff.

Frank J. Parker, U. S. Atty., Eastern District of New York, by Nathan Borock, Asst. U. S. Atty., Brooklyn, N. Y., for defendant.

BYERS, District Judge.

This is an action under Title 8 U.S.C.A. § 903, in which the plaintiff seeks a judicial declaration that he is a national of the United States.

The plaintiff's uncontradicted testimony, his identity certificate, and the State Department's records concerning his application for registration of December 22, 1944, constitute the entire record. The latter contains recitals in the final printed paragraph on page 1 which probably were intended to be stricken and have been disregarded.

The undisputed facts are that the plaintiff was born in the Borough of Brooklyn on May 22, 1916 of unnaturalized Italian parents and thereby acquired citizenship in the United States.

At the age of five years he was taken by his parents to Sicily and he continued to live there through August 2, 1946, when this complaint was filed, after which he procured the statutory certificate of identity on July 1, 1947 (Plaintiff's Exhibit 1) to enable him to maintain the action, since which time he has resided here.

In 1936, being twenty years of age, he received a notice calling him for service in the Italian Army, in which he became a musician and served for eighteen months, and then was discharged.

In 1939 he was again called for service in the Italian Army and served until 1942 in the Medical Corps and in the latter year became a prisoner of war of the British Army, probably in Africa although the evidence does not touch this subject; he obtained his release from that captivity in 1942 and was sent to his home in Sicily and there remained until 1947 at least.

When he received the second notice he did not at once comply and was put in jail for a week ("Because they thought I was a spy then"), at the end of which time he joined the Italian colors.

### Disputed Questions of Fact.

Plaintiff testified that when he received the original call for army service in 1936, "I went in Palermo to the American Consul. I say, I received notice from the Italian Army to go in and serve in the army. So I spoke to a fellow there, and he told me, 'Now, you got to go in the army. When you come back, we will see what we can do.' "

The foregoing is contrary to the recital in the "Certificate of Expatriation in the Case of Vincenzo Augello" bearing date September 17, 1937, attached to Defendant's Exhibit A, part of which is an affidavit by Alfred T. Nester, Consul of the United States, which reads in part that this plaintiff:

"has expatriated himself by taking an oath of allegiance to the King of Italy.

"The evidence of such action consists of the following:

"He joined the Italian Army on November 21, 1936, and took the oath of allegiance on June 5, 1937. He did not protest in any American consular office against serving or taking the oath. * * * He expatriated himself as aforesaid on or about June 15, 1937."

It can be seen that the plaintiff became 21 years of age on May 22, 1937.

The certificate of the Consul is entitled to the presumption of regularity which supports the official acts of public officers. U. S. v. Chemical Foundation, 272 U.S. 1, at page 15, 47 S.Ct. 1, 71 L.Ed. 131; Boissonnas v. Acheson, D.C., 101 F.Supp. 138, at page 153.

Thus the testimony of plaintiff whose interest is obvious, is opposed to the recital in a contemporary official document as to

whether he had indeed appeared before the United States Consul prior to entering into service with the Italian Army; this leaves the matter in such doubt that no satisfactory finding on that subject can be made.

As to plaintiff's having taken the oath of allegiance to the King of Italy, his testimony is:

"Q. You don't know whether you did or didn't take an oath of allegiance? A. Well, they got a ceremony. They make them swear. Everybody. I was present at the ceremony. I was playing in the band. I did not swear. I did not raise my hand, because I was playing with the band."

The recital in the Consular certificate that the plaintiff did take such an oath on June 5, 1937, over six months after joining the army, may not be greatly at variance with the plaintiff's testimony on the subject as quoted; if it is, the latter cannot be accepted because the taking of an oath is a solemn thing which may have been followed by the playing of a band, but to convince me that the actions were concurrent would call for evidence more persuasive than the foregoing.

On this subject, therefore, the Court makes the finding that the plaintiff did take an oath of allegiance to the King of Italy in connection with his first tour of duty in the Italian Army, over six months after his induction.

The next subject as to which the Court is in doubt is the plaintiff's testimony that after his discharge in 1938 and after he had gone to his home,

"Then I went to the American Consul in Palermo again, and I say, 'I want to come back to the United States'. He say, 'Now, you served in the Italian Army. You can't go no more, because,' he say, 'you lose your citizenship.'

"Q. What did you say to the American Consul's office? A. I said, 'I come here before I went in the army in 1936. I told the fellow I was going to the United States. The fellow tell me, after you come back from the army, then we will see what we can do.' "

The foregoing does not persuade standing by itself, because the plaintiff's home in Santa Ninfa (Trapani) was at least 50 miles from Palermo (see Nat. Geog. map), and it may be questioned whether in 1939 he would have made a trip of that distance merely to give voice to an indefinite statement of what he wanted to do; moreover his version of his alleged conversation in the same office in 1936 above quoted, does not recite a statement of his purpose in that year to return to the land of his birth.

On the subject of his second tour of duty with the Italian colors, he testified as follows:

"Q. Were you called back again in the army after that? A. Then the war started. Before the war started, I was called back in the army.

"Q. What year was that? A. It was in 1939. One year later. I was called back to the army. I went back to the American Consul. He say, 'Now, you got to go in the army. You belong to the army. You got to go in the army again.'

"Q. How long were you in the army at that time? A. I was in until 1942, I guess."

The plaintiff was not a convincing witness because of his uncertainty as to dates which were so important to him that his vagueness bore directly on his credibility as a witness. It must be recalled that the Court is asked to deal with a technical situation in the effort to ascertain something of the inner purposes present in 1936 in the mind of a man who obviously now would prefer to be adjudged an American citizen from the time of his birth, rather than undergo a naturalization proceeding, which is of course open to him. It must be owned that in seeking to arrive at a fair estimate of the witness' sincerity concerning his earlier state of mind, his subsequent conduct during 1943 and 1944 has been taken into consideration, namely, his apparent detachment from the vital concerns of the United States and its preservation as a nation.

692

The presence will be recalled between July 10, 1943 and September 10, 1943 of the U. S. Army of invasion of Italy, under the command of General Patton; the occupation of Sicily after the surrender of Italy on September 9, 1943 by the United States and allied forces, which continued through the years 1944 and part of 1945; that occupation involved problems of administration which were undertaken by representatives of the United States.

These matters of history are properly the subject of judicial notice: U. S. v. Hamburg-Amerikanische, etc., 239 U.S. 466, 36 S.Ct. 212, 60 L.Ed. 387; Hooker v. N. Y. Life Ins. Co., 7 Cir., 161 F.2d 852; Hunter v. Wade, 10 Cir., 169 F.2d 973, 8 A.L.R.2d 277; Alcoa S. S. Co. v. U. S., D.C., 80 F.Supp. 158.

Thus during the span of nearly three years there were present, almost at the plaintiff's doorstep, opportunities to minister to the necessities of that citizenship which he here seeks to have judicially declared, such as service in the field hospitals of the army of the land of his birth (he had been a member of the Medical Corps in the Italian army); or work in any acceptable capacity for the administrative arm of the forces in occupation; or at least the tender and refusal of such service.

During the currency of these activities arising from the conduct of war by the United States, young men of undivided nationality, resident here, were called into the service of the nation, with results that need not be here dwelt upon.

It seems clear to me that if in 1937 this plaintiff had held his United States nationality in any devotion whatever, so that his oath of allegiance to the King of Italy was an empty gesture—the creature of duress —his conduct in 1943 and 1944 would have automatically reflected such a state of mind.

The plaintiff relies upon Mandoli v. Acheson, 344 U.S. 133, 73 S.Ct. 135, in which the Court stated the precise question at issue to be:

"Does a United States citizen by birth who by foreign law derives from his parents citizenship of a foreign nation lose his United States citizenship by foreign residence long continued after attaining his majority?"

There, Mandoli, born of the same kind of parentage as this plaintiff, who had returned to Italy, when 15 years of age, sought to come to the United States only to encounter refusal of permission by the American Consul in Palermo because of his immaturity. In 1931 he served briefly in the Italian Army and six years later again tried to come to the United States and was again rejected on account of his army service, and a like effort and result followed in 1944; thereafter he instituted the cause which came to decision as stated. The District Court had held that expatriation had been accomplished on two counts, namely, his voluntary service in the Italian Army, and his continued residence in Italy after attaining his majority, which constituted an election "between his dual citizenships in favor of that of Italy."

The first ground was abandoned by the defendant since the military service was deemed to have been under duress and the Attorney General was quoted by the Supreme Court as saying,

"The choice of taking the oath or violating the law was for a soldier in the army of Fascist Italy no choice at all."

The decision of the District Court was affirmed in the Court of Appeals, 90 U.S. App.D.C. 1121, 193 F.2d 920, on the ground that Mandoli's failure to return to the United States "operated to extinguish petitioner's American citizenship." The opinion in the Supreme Court discusses that subject in announcing decision:

"If petitioner, when he became of full age in 1928, were under a statutory duty to make an election and to return to this country for permanent residence if he elected United States citizenship, that duty must result from the 1907 Act then applicable. In the light of the foregoing history, we can find no such obligation imposed by that Act; indeed, it would appear that the proposal to impose that duty was deliberately rejected (by Congress)."

While the same statute is here involved, there is no contention made by the defend-

ant that this plaintiff's failure to return to the United States in 1939 after his discharge from the Italian Army accomplished his expatriation.

 It must not be thought that this petitioner's failure to take affirmative steps to vindicate his United States citizenship in 1943 and 1944 accomplished his expatriation; that could not be the basis of this decision, since the 1907 statute contains this provision:

> "[Title 8 U.S.C. § 16.] No American citizen shall be allowed to expatriate himself when this country is at war." 34 Stat. 1228.

However as has been said, in view of conflicting evidence as to the plaintiff's oath of allegiance concerning its time and manner of administration, his demeanor and attitude in 1943 and 1944 may be consulted for such unconscious testimony as they may yield, on the subject of his 1937 mental processes.

The most recent pertinent decision is Pandolfo v. Acheson, 202 F.2d 38, by the Court of Appeals in this Circuit. That plaintiff was also born in the United States (1912) and at the age of two years was taken back to Italy by his parents who were nationals of that country; he there remained until 1949, when he procured a certificate of identity similar to that offered by this plaintiff. He served in the Italian Army and took the oath of allegiance to the King of Italy in 1933. The following is quoted from the opinion:

> "Concededly the oath of allegiance taken by the plaintiff would operate to expatriate him if taken voluntarily, but would not if taken under duress. Consequently the question presented by the appeal is whether the ruling that his oath was taken under duress is supportable on the facts developed at the trial.

> "There is no dispute as to the facts. The only testimony was given by the plaintiff; the other evidence was documentary, for the most part consisting of the plaintiff's Italian military service record."

The facts as shown in the opinion are sufficiently like those in this record, to indicate the close resemblance between the two cases. The opinion continues:

> "We agree with the Government's contention as to burden of proof in a suit of this character. The plaintiff has the burden of proving that he is a United States citizen. He made a prima facie case by alleging and proving his birth in New York. The Government then had the burden of showing that he had expatriated himself. This it did by proof of his oath of allegiance to the King of Italy. Presumptively this oath was voluntarily taken. He then had the burden of going forward with evidence to establish that it was taken under duress. The trial court found that this was the fact. The appellant contends that the court should not have accepted the plaintiff's uncorroborated testimony, and particularly since other portions of his testimony were found incredible. But it is elementary that the trier of facts need not discredit all the testimony of a witness because part of it is not believed. There is no legal requirement that testimony of duress be corroborated by documentary or other proof. The trial judge saw the witness and believed his testimony that induction into military service and the oath thereafter taken was done under duress. We cannot say that the finding of duress was 'clearly erroneous,' as we must to reverse the finding."

 It may not be entirely fair to this plaintiff to decide that the oath of allegiance to the King of Italy which he apparently took on June 5, 1937 was not under duress because his conduct six or seven years later as portrayed in this record is thought to be consistent with a true and inward fidelity to the Sovereign of Italy at that time, rather than to submission to duress. Probably he ought to be given an opportunity to adduce evidence that would destroy the validity of the reasoning in which the court has indulged by showing that during the years of 1943 and 1944 he

did indeed endeavor to perform one or more of the duties consistent with the teachings of that citizenship which he now seeks to have declared.

This means that judgment is presently ordered for the defendant, without prejudice however to the right of the plaintiff to move to reopen the case for the sole purpose of offering such evidence as may be available to him directed to the single issue above indicated, if he be so advised.