**TERADA v. DULLES.**
Civ. No. 1266.

United States District Court,
Hawaii.
May 19, 1954.

Fong, Miho, Choy & Chuck, Honolulu, Hawaii, A. L. Wirin & Fred Okrand, Los Angeles, Cal., for plaintiff.

A. William Barlow, U. S. Atty., Dist. of Hawaii, Honolulu, Hawaii, Louis B. Blissard, Asst. U. S. Atty., Dist. of Hawaii, Honolulu, Hawaii, for defendant.

McLAUGHLIN, Chief Judge.

This is a citizenship case, brought under Section 903 (repealed) of Title 8, United States Code,[1] in which a declaratory judgment is sought upon a complaint filed December 19, 1952, and amended March 16, 1954. The savings clause has preserved the life of the litigation. 8 U.S.C.A. § 1101, note.

The facts are typical of many recent cases in this District. Involved is a dual citizenship status, and an administrative denial of a right or privilege based on an assertion of loss of American nationality because of service in the Japanese Army or voting in a Japanese political election.

Upon the surface, the issue appears to be whether or not plaintiff's acts of military service in the Japanese Army, and of voting in Japan in an election authorized by General MacArthur as head of the Occupation Forces then in control of Japan were or were not his free and voluntary acts. If either act was voluntary, it is contended by the defendant upon the strength of respected old cases, as well as new authorities, that the plaintiff lost, despite his lack of actual knowledge, intent or consent, his American citizenship. Savorgnan v. United States, 1950, 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287; Perkins v. Elg, 1939, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320; Perri v. Dulles, 3 Cir., 1953, 206 F.2d 586; Lehmann v. Acheson, 3 Cir., 1953, 206 F.2d 592; Takehara v. Dulles, 9 Cir., 1953, 205 F.2d 560; Acheson v. Mariko Kuniyuki, 9 Cir., 1951, 189 F.2d 741; Hichino Uyeno v. Acheson, D.C.Wash.1951, 96 F.Supp. 510. Cf. Tomoya Kawakita v. United States, 1952, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249.

With due respect to the identity, age, and volume of authorities relied upon, I do not believe they correctly state the law. The error should not be further perpetuated. Below the surface, the real issue constantly overlooked is whether Congress has the unilateral power to take away citizenship granted native-born by the Constitution itself. If it has not, may it find a voluntary renunciation by reading into the doing of such colorless acts as it may specify, today or tomorrow, a really non-existent intent or consent to forfeit a birthright? In brief, absent the factor of consent of both the sovereign and the individual, is not native citizenship indestructible? If so, should not Congress confine itself to punishing offending citizens for treason and lesser crimes?

1. Now 8 U.S.C.A. § 1503.

Complicating this fundamental domestic question is the further question of the legal consequences flowing from dual citizenship. Should one, assuming Congress has the power, be compelled by law to sacrifice his American heritage for doing in the other country to which since birth he also has been legally related, that which by its laws he had a right, privilege, or duty to do?

### Findings of Fact

The pertinent facts are found to be as follows:

A. The plaintiff, age 34, was born in Honolulu, Hawaii, June 8, 1919, to parents who were subjects of Japan.

B. Plaintiff's birth, under these circumstances, brought into being two legal facts which related exclusively to him, to wit, he became simultaneously a native-born citizen of the United States and also a subject of Japan.

C. Plaintiff went to Japan after being graduated from a public high school in Hawaii, for further education in the Japanese language. He attended Meiji University and was graduated in January 1942.

D. On December 2, 1941, gathering war clouds moved him to engage passage for Hawaii on the N. Y. K. liner Tatsuta Maru. He sailed from Yokohama, and back thereto as a consequence of the outbreak of war on December eighth (Japan's calendar), while the ship was at sea. Plaintiff thereafter resumed and completed his university work.

E. Upon being graduated in January 1942 from Meiji University, plaintiff went to work for the Domei News Agency, translating Japanese into English.

F. In August 1944, despite a claim to exemption based solely upon physical reasons, namely, minor ear and eye defects, plaintiff was inducted by conscription as a Japanese national into the Japanese Army—Infantry. Plaintiff was discharged in September 1945 as a private first class.

G. The plaintiff responded to the draft as a law-abiding resident Japanese national. He was also aware of the legal sanctions imposed upon violators. Too, evasion of the law was not considered for fear of the Kempei Tai, or Japanese Military Police, who, rumor had it, beat up, killed or shipped to exile draft dodgers. Further, to have resisted would have been to disgrace the family name and possibly to bring about reprisals upon or disgrace to his wife and grandparents, who were Japanese nationals.

H. After the war, his application as an asserted citizen for a United States passport being denied on the ground that he had expatriated himself from the United States by serving in the Japanese Army, plaintiff went to work for the Army of Occupation as a Japanese national.

I. Being as a resident Japanese national legally eligible to vote, knowing of General MacArthur's military directive authorizing Japan's first free general political election in which he stressed the importance of doing all things needed, including strict enforcement of laws protecting the secrecy of the ballot (Exhibit M, p. 136), being cognizant not only of the strong urgings of press and radio of all to be patriotic and do their duty by voting, but aware, too, of rumors that failure to vote might cause a loss of food ration privileges then obtaining under military government of the occupation forces, though not believing such loss would bring about death by starvation—for these reasons—the plaintiff voted in the Japanese general election of April 1946—but in no subsequent elections.

### Conclusions of Law

A. The plaintiff's service in the Japanese Army, pursuant to draft as a national of that country while resident therein and directly subject to its immediate jurisdiction, was involuntary service, not effecting expatriation.

B. Although our country recognizes dual citizenship; although Japan in

April 1946 had been defeated in war and was occupied by the victors who established a military government which authorized the election; though being resident in Japan, and as a subject entitled as well as expected to vote—still, as the law is now written and interpreted, the plaintiff would lose his American nationality by voting in Japan in April 1946, except that as applied to the facts in this situation, 8 U.S.C. § 801 (e) [2] is unconstitutional in that Congress is devoid of power to take away native citizenship.

## Opinion

■ Finding as a fact that the plaintiff was conscripted under the military law of Japan into its Army, applicable law dictates that such involuntary conduct did not effect a forfeiture of his American citizenship under 8 U.S.C.A. § 801(c). Mandoli v. Acheson, 1952, 344 U.S. 133, 73 S.Ct. 135, 97 L.Ed. 146; Perri v. Dulles, supra; Lehmann v. Acheson, supra.

Because of this finding of fact, the question of the constitutionality of the cited statute does not come into focus.

To see it clearly, and to come to grips with it, we pass to the voting issue.

At the threshold, it is pertinent to inquire: What if the plaintiff did vote? He was a subject of Japan. He was in Japan. He was eligible to vote. He was expected to vote. General MacArthur expressed publicly the wish that all eligible voters do so. Owing allegiance to both Japan and the United States, how under these circumstances can the law rationally say that this act of voting denotes either an intentional change of allegiance or a preference between his two loves? In a valid dual citizenship situation, none of the parties should be emotionally disturbed by professions of loyalty to the other object of the individual's allegiance. To read out a citizen for reasons of jealousy effects cruel and abusive civil punishment.

■ Next, we should inquire if the election was political and in a foreign country. My personal doubts that in 1946 occupied Japan was a full and independent sovereignty within the meaning of the statute are not decisive, since the Court of Appeals for the Ninth Circuit has decided otherwise, and its opinion controls. Acheson v. Mariko Kuniyuki, supra; Hichino Uyeno v. Acheson, supra.

We now pass to a consideration of whether or not the plaintiff's act of voting was his free and voluntary act.

I have found that factually the plaintiff voted voluntarily. I base this conclusion upon these considerations: First, I am not satisfied that the factors cited by the plaintiff actually resulted in a legal compulsion to vote in his individual case. The plaintiff offered several good reasons of a retrospective nature for what was obviously the real reason, to wit: he was eligible, it was expected, and he did his duty like a good citizen of new Japan. The MacArthur directive authorizing the election and safeguarding its free and voluntary nature by strict enforcement of law guaranteeing a secret ballot does not spell out legal coercion. Press and radio campaigns aimed at getting out the vote American style did not overpower plaintiff's free will though they may have spurred him on to perform a civic duty. And as for rumors of loss of food rationing privileges—that I evaluate as so much makeweight, unsubstantiated talk. Rumors without even a semblance of foundation cannot stand as a firm base for a legal conclusion of coercion or duress. Surely, these rumors, even if true, did not overcome plaintiff's volition. He was a mature, 26-year old male in Japan, equipped with a University education, and quite capable of recognizing facts and distinguishing irresponsible rumor. In my view, the plaintiff has failed to prove his assertion that he was forced or compelled to vote. On the contrary, the evidence plainly indicates that he voted be-

2. Now 8 U.S.C.A. § 1481(a).

cause he wanted to do his duty as a Japanese subject. His unsubstantiated, self-serving afterthoughts do not erase this fact.

At this point, it would seem that the law as expressed in the cited cases would compel a holding that the plaintiff has lost his citizenship by said voluntary voting. And so it does—if 8 U.S.C. § 801(e) is constitutionally applied to such a case.

█ As I have held before, I now hold again that 8 U.S.C. § 801(e), here invoked to show a loss of citizenship existing by birth, is outside the power of Congress and therefore unconstitutional as applied in these circumstances.

█ The power of naturalization which Congress had under the Constitution is a power to confer citizenship, not a power to take it away. The simple power of the National Legislature is to prescribe a uniform rule of naturalization, and the exercise of this power exhausts it so far as respects the individual. Nor has the Fourteenth Amendment conferred authority on Congress to restrict the effect of birth, which, under the Constitution, is a complete basis for citizenship. Minoru Yasui v. United States, 1943, 320 U.S. 115, 117, 63 S.Ct. 1392, 87 L.Ed. 1793; Mackenzie v. Hare, 1915, 239 U.S. 299, at page 306, 36 S.Ct. 106, 60 L.Ed. 297; United States v. Wong Kim Ark, 1898, 169 U.S. 649, at page 703, 18 S.Ct. 456, 42 L.Ed. 890; Perri v. Dulles, 3 Cir., 1953, 206 F.2d 586.

This is a government of enumerated powers, although it has full attributes of sovereignty within the limits of those powers. In re Debs, 1894, 158 U.S. 564, at page 578, 15 S.Ct. 900, 39 L.Ed. 1092. No attempt can reasonably be made now to limit the national powers strictly to those expressly mentioned, as other incidental or necessary powers are and must be implied to permit full exercise of the express powers. United States v. Darby Lumber Co., 1940, 312 U.S. 100, at page 121, 657, 61 S.Ct. 451, 85 L.Ed. 609. However, we think it cannot be seriously contended that the power to confer citizenship requires, or even permits, as an aid to its exercise, the existence of an implied power to take citizenship away from a native without his consent. Except in the case of the exercise of the powers granted to Congress, and those necessarily implied therefrom, the crown of sovereignty fits badly and rests uneasily on the head of a government of enumerated powers. Sovereignty will not, by its bare assumption, justify this action against a citizen without his consent.

Although the unilateral power of denaturalization cannot be demonstrated, still it seems to have been taken for granted that in connection with the federal matter of national citizenship there might be implied the ability to accept a declaration by a citizen that he shall shed the duties of allegiance and the privileges of citizenship. See United States v. Wong Kim Ark, 1898, 169 U.S. 649, 704, 18 S.Ct. 456, 42 L.Ed. 890; 15 Stat. 223 (1868); 8 U.S.C.A. § 1481 (a)(1, 6, 7). This declaration by the citizen may be found in his express words: Savorgnan v. United States, 1950, 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287, or as a necessary inference from certain significant acts when voluntarily done, as in Mackenzie v. Hare, 1915, 239 U.S. 299, 36 S.Ct. 106, 60 L.Ed. 297. That case upheld validity of a statute which deprived any American woman, voluntarily marrying an alien, of her citizenship. The Court imputed knowledge of the consequences to the wife from the existence of the statute, in finding the loss voluntary on her part. However, it appeared that the unique nature of the marital relationship, the frequency of the application among nations of the theory of fusion on marriage of identities and nationalities into that of the husband, and the possible involvement of the United States in international problems in following a different policy justified the effect of the statute even though it resulted from an innocent and lawful act. The Court indicated that only conditions of national moment

would justify such imputation of consent from an otherwise lawful and nonsignificant act; this indication was in answer to the fear expressed in argument that upholding that statute might make it possible that every act, however lawful, might be considered a renunciation of citizenship.

From very early times, it has been recognized that peculiar circumstances may give rise to dual citizenship and the ensuing multiplication of rights and duties in the same individual. Shanks v. Dupont, 1830, 3 Pet. 242, at page 248, 7 L.Ed. 666; Ops. Executive Depts. on Expatriation, Naturalization and Allegiance (1873) 17, 18; U.S. Foreign Relations, 1873–74, pp. 1191, 1192. (Latter two citations noted in United States v. Wong Kim Ark, 169 U.S. 649, at page 691, 18 S.Ct. 456, 42 L.Ed. 890. It has also been recognized that where dual citizenship exists, one having it need not make a choice, but can continue his dual status: Mandoli v. Acheson, 1952, 344 U.S. 133, 73 S.Ct. 135, 97 L.Ed. 146, and that an American having Japanese citizenship also has obligations to Japan arising from his presence in that country, which, together with his rights and privileges attached, need not necessarily be inconsistent with citizenship in the United States when they are observed in Japan: See Tomoya Kawakita v. United States, 343 U.S. 717, 725, 734, 72 S.Ct. 950, 96 L.Ed. 1249. Furthermore, the Executive Branch of the United States is stated in Kawakita to have taken the position that a dual citizen who lives abroad *in the other country of his nationality* owes allegiance "paramount" to that then owed to the United States. As applied to such innocuous actions as voting, we think this position is entirely sensible, and not inconsistent with the Supreme Court's recognition in Kawakita of the possible existence of rights and duties pertaining to each citizenship which are not incompatible with each other.

Whether Mackenzie would be decided the same way today is doubtful, but there may well be continuing validity in the basic principle there followed in imputing consent to expatriation from other acts relating to conditions of national moment, even if the acts are lawful. One of these significant acts might be the qualification to vote, and voting in a foreign election by a "univalent" American citizen—one who has no dual citizenship—but where it is done by a dual citizen, the act of voting in a foreign election, based upon his citizenship and physical presence there, loses much of its significance as an act of national importance to this country.

It is doubtful that the exercise of the right to vote by citizens of another country could ever be of such importance to this country that it should take notice of such actions as being inconsistent with our national interests. It has importance, however, but in the sense that it is *consistent* with the policy of this country, in existence for many years, to encourage the use of the free ballot by other peoples, and nowhere can it be said that our influence has been stronger in this field than in Japan. (See Directive by General MacArthur re elections in Japan, cited in plaintiff's Exhibit "M"). Such has been the action of the right hand of the United States, while with its left it imposes severe civil penalties upon certain foreign-and-United States citizens who, while present in the foreign country, act in accord with the policy this country espouses. The existence of this policy makes it very difficult to suppose that such voting, there, by a few individuals of dual citizenship, could be an act of such moment to the United States in the sense that term is used in Mackenzie, that an imputation of consent to expatriation therefrom could be justified. We think no such imputation can be made, therefore, in this case. We regard these principles as distinct from the situation where a statutory measure is tested for substantive due process by asking whether it is a reasonable means of attaining an objective clearly within the power of Congress.

Without this essential element of consent by the citizen, the statutory attempt to expatriate the citizen unilaterally is beyond the power of Congress, and therefore invalid. Thus, this petitioner did not lose his United States citizenship by a voluntary act of voting in occupied Japan.