Angelika L. SCHNEIDER, Plaintiff,

v.

Dean RUSK, individually and as Secretary of State, Defendant.

Civ. A. No. 324–60.

United States District Court
District of Columbia.

May 21, 1963.

Charles Fahy, Circuit Judge, dissented.

Milton V. Freeman, Werner J. Kronstein, and Robert E. Herzstein, Washington, D. C.; Horst Kurnik, New York City, Charles A. Reich, New Haven, Conn., and Arnold, Fortas & Porter, Washington, D. C., for plaintiff.

Archibald Cox, Solicitor Gen., Herbert J. Miller, Jr., Asst. Atty. Gen., J. William Doolittle, Asst. to the Solicitor Gen., Beatrice Rosenberg, J. F. Bishop, Attys., Dept. of Justice, Washington, D. C., for defendant.

Jack Wasserman, David Carliner, Washington, D. C., and Melvin L. Wulf, New York City, for American Civil Liberties Union as amicus curiae.

Before FAHY, Circuit Judge, and KEECH and MATTHEWS, District Judges

MATTHEWS, District Judge.

The plaintiff, a national of Germany at birth who became in 1950 a naturalized citizen of the United States, has been declared to have lost her American citizenship by reason of residing continuously in the foreign country of her origin for three years. The issue she raises before the court is whether this divesture of citizenship accords with the Constitution. The statute [1] relied upon by the Government to effect the expatriation of plaintiff, hereafter referred to as Section 352(a) (1), reads in pertinent part:

"(a) A person who has become a national by naturalization shall lose his nationality by—

"(1) having a continuous residence for three years in the territory of a foreign state of which he was formerly a national or in which the place of his birth is situated * *."

Residence as the term is used in Section 352(a) (1) is defined as follows:

"The term 'residence' means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent. Residence shall be considered continuous for the purposes of sections * * * and 352 * * * where there is a continuity of stay but not necessarily an uninterrupted physical presence in a foreign state * *." [2]

In February 1960, plaintiff brought this suit for a judgment declaring her to be a citizen of the United States and enjoining the enforcement of Section 352 (a) (1) by the Secretary of State. She moved for the convening of a three-judge court pursuant to 28 U.S.C. §§ 2282 and 2284 to try the case. The District Court concluded that plaintiff's complaint presented no substantial constitutional issue and denied her motion to convene a

1. Section 352(a) (1) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1484(a) (1), successor and counterpart to Sec. 404(b) of the Nationality Act of 1940, 54 Stat. 1137 at page 1170.

2. Section 101(a) (33) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101(a) (33).

three-judge court, relying on Lapides v. Clark, 85 U.S.App.D.C. 101, 176 F.2d 619, cert. denied, 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527, rehearing denied, 338 U.S. 888, 70 S.Ct. 187, 94 L.Ed. 545, in which the Court of Appeals for the District of Columbia Circuit had directly upheld the predecessor of a companion provision[3] which deprived the naturalized American of citizenship for continuous residence for five years in any foreign state.

Thereafter, the court granted a motion of the defendant Secretary of State for judgment on the pleadings and on the basis of Lapides the Court of Appeals affirmed. But the Supreme Court vacated these judgments, stating in a per curiam opinion that its intervening decisions in Perez v. Brownell, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603, and Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630, reveal that the constitutional questions involving deprivation of nationality which were presented to the district judge were not plainly insubstantial, and the case was remanded to the District Court for hearing on its merits by a three-judge court. Schneider v. Rusk, 372 U.S. 224, 83 S.Ct. 621, 9 L.Ed.2d 695. Accordingly this three-judge court has been convened, and the matters before the court are the motion of the plaintiff for summary judgment and that of the defendant for judgment on the pleadings.

The facts are not in dispute. The plaintiff was born in 1934 in Rimsting-am-Chiemsee, Bavaria, in what is now the Federal Republic of Germany, and in 1939 came to the United States with her family. In 1950 she became a naturalized citizen of the United States through the naturalization of her mother. She lived in the United States from 1939 to 1954. During 1954 and 1955 she studied at a University in Switzerland and in the following year was a full-time student at the Sorbonne in Paris. Returning to the United States in April 1956, she was employed in New York for a few months and on June 6, 1956 left for Germany where she married a German national on July 4, 1956. Since that time plaintiff has lived continuously with her husband in Germany for a period of more than three years except for one visit of six weeks to relatives in the United States in 1957. She intends to continue to live in Germany and has no definite intention to return to the United States to reside. In June 1959 the United States Consulate at Dusseldorf refused to grant an extension of the plaintiff's United States passport, contending that she had lost her American citizenship. The plaintiff was requested by the American Consulate in September 1959 to surrender her naturalization certificate which she did under protest. On November 25, 1959, the plaintiff was given a "Certificate of the Loss of the Nationality of the United States." The Board of Review on the Loss of Nationality in the State Department in Washington affirmed the previous administrative decision that plaintiff had expatriated herself pursuant to Section 352(a) (1). This action on January 20, 1960 was the final administrative determination of the State Department.

The plaintiff is now stateless, the provision of the German Nationality Act imposing German nationality upon a woman marrying a German national having been repealed.[4] But upon her application plaintiff may easily resume German citizenship because of her husband's German nationality.[5] She has not done so because of her desire to retain United States citizenship. Two sons born in Germany of her marriage, one in 1957 and the other in 1958, have been registered with the United States Consulate

---

3. Section 404(c) of the Nationality Act of 1940, 54 Stat. 1137 at page 1170, now Section 352(a) (2) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1484(a) (2).

4. Laws Concerning Nationality, U.N.Doc. No. ST/LEG/SER.B/4, p. 179, Sec. 6 & note 4 on pp. 178–179, also p. 187.

5. Brief For Petitioner in the Supreme Court of the United States Oct. Term 1962, No. 251, p. 38, Note 15.

as citizens of the United States but they are also German nationals.[6] Moreover, each child is subject to loss of his American citizenship if he fails to meet the requirement of continuous physical presence in the United States for at least five years following his attainment of the age of fourteen years and previous to his arrival at the age of twenty-eight years.[7]

In challenging Section 352(a) (1) plaintiff contends that it bears no reasonable relationship to any power granted to Congress and therefore is outside the bounds of the Constitution. She maintains that she cannot validly be expatriated against her will and that her American citizenship remains intact, despite her continuous residence for three years in the foreign country of her origin. She also argues that since native-born citizens are not divested of their American nationality for prolonged residence abroad, Section 352(a) (1) discriminates against naturalized citizens and thus denies them liberty and due process of law, contrary to the Fifth Amendment. A further contention of plaintiff is that her purported deprivation of citizenship constitutes cruel and unusual punishment in contravention of the Eighth Amendment to the Constitution.

From the historical evolution of the legislation in question it appears that Congress was attempting to exercise its power to regulate foreign affairs when it decreed that continuous residence for three years by a naturalized citizen in the country of his origin should result in expatriation. While the Constitution contains no specific grant to Congress of power to legislate for the effective regulation of foreign affairs, "there can be no doubt of the existence of this power in the law-making organ of the Nation." Perez v. Brownell, 356 U.S. 44, 78 S.Ct.

568, 2 L.Ed.2d 603. As was there said at page 57 of 356 U.S., 78 S.Ct. at page 575:

"The States that joined together to form a single Nation and to create, through the Constitution, a Federal Government to conduct the affairs of that Nation must be held to have granted that Government the powers indispensable to its functioning effectively in the company of sovereign nations. The Government must be able not only to deal affirmatively with foreign nations, as it does through the maintenance of diplomatic relations with them and the protection of American citizens sojourning within their territories. It must also be able to reduce to a minimum the frictions that are unavoidable in a world of sovereigns sensitive in matters touching their dignity and interests."

Prior to the Nationality Act of 1907 Congress had not defined by statute or otherwise what may constitute expatriation, and the Department of State was forced to look elsewhere for an enumeration of the acts which might have that effect.[8] The policy of the United States varied as to the assistance and protection which it would afford naturalized citizens who returned to their native land. The many executive utterances on this subject throughout the 19th Century show the magnitude of the problem.[9] It is clear that even prior to 1907 the State Department considered in many instances that a naturalized citizen who returned to his native land for a protracted period had expatriated himself or forfeited the protection of this Government, especially if he manifested no intention of returning to the United States.[10]

6. Laws Concerning Nationality, U.N.Doc. No. ST/LEG/SER.B/4, p. 179, Sec. 4.

7. 8 U.S.C. § 1401(b). See also 8 U.S.C. § 1482 regarding dual nationals.

8. Fish to Washburne, June 28, 1873, 3 Moore, Digest of International Law (1906), 712; President Grant, annual

message, Dec. 1, 1873, id., at pp. 712–13; Perez v. Brownell, 356 U.S. 44, at page 49, 78 S.Ct. 568, at page 571.

9. 3 Moore, Digest of International Law, pp. 562–715, 735–757, 766–771.

10. E. g., Smith to Hance, Jan. 21, 1867, 3: Moore, Digest of International Law at:

The rationale for this policy was set forth in a Circular [11] of March 27, 1899, issued by Mr. Hay, Secretary of State, to United States diplomats and consular officers, as follows:

"This Government does not discriminate between native-born and naturalized citizens in according them protection while they are abroad * * *. But in determining the question of conservation of American citizenship and the right to receive a passport, it is only reasonable to take into account the purpose for which the citizenship is obtained. A naturalized citizen who returns to the country of his origin and there resides without any tangible manifestation of an intention to return to the United States may * * * generally be assumed to have lost the right to receive the protection of the United States. His naturalization in the United States can not be used as a cloak to protect him from obligations to the country of his origin while he performs none of the duties of citizenship to the country which naturalized him. The statements of loyalty to this Government which he may make are contradicted by the circumstance of his residence, and are open to the suspicion of being influenced by the advantages he derives by avoiding the performance of the duties of citizenship to any country. It is not to be understood by this that naturalized American citizens returning to the country of their origin are to be refused the protection of a passport. On the contrary, full protection should be accorded to them, until they manifest an effectual abandonment of their residence and domicil in the United States."

Until 1868 there was doubt as to how far the doctrine of perpetual allegiance derived from our former colonial relations with Great Britain was applicable to American citizens. In that year Congress swept away these doubts by decreeing that it is "a natural and inherent right of all people" to divest themselves of allegiance to any state, 15 Stat. 223, R.S. § 1999, being motivated, at least in part, by the refusal of England and other nations to recognize the right in naturalized Americans to cast off their former allegiance. This legislation has been applied to the divestment by native-born and naturalized Americans of their United States citizenship. But Congress did not in this law indicate what acts were to be deemed to work expatriation.

At about this same time the United States negotiated a naturalization treaty with the North German Confederation by which each country agreed to recognize the naturalization of its own natives by the other. This treaty further provided that if a German naturalized in America renewed his residence in North Germany without the intent to return to America he would be held to have renounced his naturalization in the United States and that the intent not to return could be held to exist when the person naturalized in the one country resided more than two years in the other country. 15 Stat. 615, 616–617. Thereafter the United States concluded similar naturalization treaties with other nations. E. g., 15 Stat. 687, (Mexico), 17 Stat. 941 (Denmark). However, some nations, including a number of important ones, refused to enter into such treaties. E. g., 3 Moore, Digest of International Law, pp.

p. 737; Frelinghuysen to Herdocia, Dec. 8, 1882, id. at p. 739; Davis to Barnett, Aug. 20, 1884, ibid; Bayard to Lee, July 24, 1886, id. at pp. 740–741; Rives to Proios, Oct. 25, 1888, id. at pp. 741–742; Gresham to Terrell, Aug. 27, 1894, id. at p. 743; Adee to Little, July 13, 1895, ibid; Fish to Hall, May 3, 1869, id. at p. 766; Williams, At.-Gen., Aug. 20, 1873,

id. at p. 768; Frelinghuysen to Lowell, Feb. 27, 1884, ibid; Porter to Curry, Jan. 4, 1886, id. at p. 768–769; Porter to Meyer, June 30, 1887, id. at p. 769; Uhl to Willis, May 14, 1895, id. at p. 770; and see also id. at pp. 947–950, and 952–966.

11. 3 Moore, Digest of International Law, p. 950.

604–607 (Greece), 609 (Italy), 622 (Russia). Moreover, the treaties themselves required administrative construction. 3 id., pp. 744–757.

Meanwhile, the Executive Department urged Congress to enact further legislation defining the acts by which citizens should be held to have expatriated themselves, especially in view of the problems raised by citizens residing permanently abroad. E. g., Message of President Grant to Congress, Dec. 1, 1873, 6 Messages and Papers of the Presidents, Richardson Ed., 1897, pp. 4193–4194, and Message of President Grant to Congress, Dec. 7, 1874, id. at pp. 4245–4246. In his message of December 1, 1873, President Grant pointed out:

"In some cases * * * naturalized citizens of the United States have returned to the land of their birth with intent to remain there, and their children, the issue of a marriage contracted there after their return, and who have never been in the United States, have laid claim to our protection when the lapse of many years had imposed upon them the duty of military service to the only government which had ever known them personally."

In his message of Dec. 7, 1874, President Grant said:

"I have again to call the attention of Congress to the unsatisfactory condition of the existing laws with reference to expatriation and the election of nationality. * * * Congress by the Act of the 27th of July, 1868, asserted the abstract right of expatriation as a fundamental principle of this Government. Notwithstanding such assertion and the necessity of frequent application of the principle, no legislation has been had defining what acts or formalities shall work expatriation or when a citizen shall be deemed to have renounced or to have lost his citizenship. The importance of such definition is obvious. The representatives of the United States in foreign countries are continually called upon to lend their aid and the protection of the United States to persons concerning the good faith or the reality of whose citizenship there is at least great question. In some cases the provisions of the treaties furnish some guide; in others it seems left to the person claiming the benefits of citizenship, while living in a foreign country, contributing in no manner to the performance of the duties of a citizen of the United States, and without intention at any time to return and undertake those duties, to use the claims to citizenship of the United States simply as a shield from the performance of the obligations of a citizen elsewhere."

Finally in 1906 a Senate Resolution and a recommendation of the House Committee on Foreign Affairs called for an examination of the problems relating to American citizenship, expatriation, and protection abroad. This led to the appointment by the Secretary of State of a Citizenship Board composed of the Solicitor of the State Department, the Minister to the Netherlands and the Chief of the Passport Bureau. After a study this Board made a report with recommendations. In its report, H.R. Doc. No. 326, 59th Congress, 2nd Session, the Board noted at pages 25–27 that "Expressed renunciation of American citizenship is * * * extremely rare; but the class of Americans who separate themselves from the United States and live within the jurisdiction of foreign countries is becoming larger every year, and the question of their protection causes increasing embarrassment to this Government in its relation with foreign powers"; that immigration "to the United States has of recent years reached proportions hitherto unheard of, and many of these immigrants will become naturalized citizens of the United States"; that "naturalized citizens are more apt to go abroad than native citizens"; that having "already changed their domicile, they are more apt to change it again"; that one reason "why

the attempts which have been made in the past to secure a legislative definition of expatriation have failed is undoubtedly because the necessity has been slight in comparison with the necessity which now exists"; that it "is difficult to determine when those who have been absent from the United States for a long time and who give no tangible evidence of an intention of returning should be left without protection"; that when "they are refused they are aware that it is in the discretion of the Executive to accord them protection;" that "they are aware that the policy toward them has not been stable and that one official may grant what another has refused"; that they "do not accept, therefore, a refusal as final, but strain their energies to induce a change of decision, and their cases remain open while their status remains undefined"; and that it "seems to be clear that these people have by their own act worked their own expatriation, and that their status should be put beyond the uncertainty or fluctuations of executive policy by a declaratory law."

The Board recommended that a law be passed providing among other things that "expatriation of an American citizen may be assumed" when in time of peace, he obtains naturalization in a foreign state, or engages in the service of a foreign state where such service involves the taking of an oath of allegiance to that state, or "becomes domiciled in a foreign state, and such domicil may be assumed when he shall have resided in a foreign state for five years without intent to return to the United States", the presumption of expatriation to be rebuttable. Id. at p. 23.

On the basis of this report and recommendations Congress in passing the Nationality Act of 1907, 34 Stat. 1228, provided in Section 2 that when any naturalized citizen had resided for two years in the foreign state from which he came, or for five years in any other foreign state, it would be presumed that he had ceased to be an American citizen, and the place of his general abode would be deemed his place of residence during said years. However, it was further provided that such presumption might be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States under such rules and regulations as the Department of State might prescribe. It was stated in the House by the Representative who introduced the measure that the provisions regarding naturalized citizens were designed to discourage people from evading responsibilities both to other countries and to the United States and to save our Government from "becoming involved in any trouble or question with foreign countries where there is no just reason." 41 Cong.Rec. 1463–1464.

However, the provision of the 1907 law regarding expatriation of naturalized citizens did not prove satisfactory. In 1928 Attorney General John G. Sargent described it as being "so loosely drawn that its operation and effect have been in doubt ever since its passage." 35 Ops.Attys.Gen. 399, 404. He deemed it "obvious that clarifying legislation is desirable", citing the 1795 decision of the Supreme Court in Talbot v. Jansen, 3 Dall. 133, 154, 1 L.Ed. 540, in which it is declared that a statute of the United States "relative to expatriation, is much wanted" and besides "ascertaining by positive law the manner in which expatriation may be effected, would obviate doubts, render the subject notorious and easy of apprehension, and furnish the rule of civil conduct on a very interesting point."

At the request of the House Committee on Immigration and Naturalization, 86 Cong.Rec. 11943, President Roosevelt appointed in 1933 a committee composed of the Secretary of State, the Attorney General and the Secretary of Labor to study the existing laws governing nationality, to codify them, and to recommend such changes as might seem desirable. Five years were spent in study and research by specialists representing the three departments. A draft code submitted by this committee contained a provision that a naturalized

citizen (unless he came within specified exceptions) should lose his citizenship by residing continuously for three years in the territory of a foreign state of which he was formerly a national or in which his place of birth is situated. Nationality Laws of the United States, 1938, Part 1, House Committee Print, 76 Congress, 1st Sess., p. 69.

The Committee concluded in its report that the existing law had been found "to a considerable extent to be insufficient and unsatisfactory, since, as construed by the courts, the presumption of loss of citizenship arising under its terms never became final, regardless of the length and cause of the foreign residence * * *." Id. p. 70. The report further pointed out that

" * * * before an alien is admitted to the privilege of citizenship, under the law of the United States, he is required to declare under oath that he intends to reside in the United States, and, if he fails to observe this obligation, he cannot complain of the withdrawal of the privilege granted.

"The problem presented by naturalized citizens residing, for insufficient reasons, in the foreign states in which they were born or of which they were formerly nationals, of whom there are thousands at the present day, has been a cause of difficulty and embarrassment to the Government of the United States in its efforts to extend protection to other naturalized citizens in meritorious cases."

Consideration was given by the Committee of whether the loss of nationality should be made to result directly from the fact of foreign residence, or should be made dependent upon proceedings in the courts. It was concluded by the committee that the termination of American nationality should be *automatic,* resulting directly from the fact of foreign residence since proceedings in the courts would be cumbersome, long drawn out and expensive to the Government. It was deemed desirable, however, to frame the provision in such a way as to avoid making the termination dependent upon the judgment or discretion of a diplomatic or consular officer or of officers of the Department of State itself or any other branch of the executive. It was thought that the function of these officers should be limited as far as possible to the findings of fact and the application of the statute to each case accordingly. Id. at p. 71.

The report of the committee appointed by President Roosevelt further stated that while a provision for loss of nationality in cases of naturalized citizens who reside for three years in their countries of origin may appear to be "somewhat drastic", it was believed to be

"fully warranted by the numerous cases which have been brought to the Department's attention in past years, especially in connection with applications for passports or consular registration, for diplomatic protection, or for the support of claims against the governments of such countries. This provision is not in conflict with the position taken by the Government of the United States in past years with regard to the protection of naturalized citizens or with the treaties on that subject to which the United States is, or has been a party * * *. On the contrary, it agrees in spirit with the provisions in the naturalization treaties concerning naturalized citizens who return to their countries of origin for permanent or indefinite residence. It is not to the advantage of the United States to attempt to extend diplomatic protection to such persons, who are a distinct liability, rather than an asset, to this country. Moreover (what is quite important), it is believed that a definite provision for the termination of American nationality in these cases will have the effect of persuading foreign states with which the United States has no treaties of naturalization to conclude such treaties and to recognize the Ameri-

can nationality of the persons concerned when they return to their countries of origin for legitimate objects and for residence of a temporary character." Id. at p. 71.

In stating their reasons for support of a provision denationalizing naturalized citizens for prolonged residence in the foreign countries in which they were born or of which they were formerly nationals, the committee named by President Roosevelt, pointed out, Id. at page 71, that

"Reports from diplomatic and consular officers show that, in the vast majority of cases of naturalized citizens residing abroad, they have their residence in such foreign states. The number of these cases is very large, and they are a constant source of irritation. Their existence has rendered it difficult to make fully effective the principle, which this Government has long sought to maintain, that naturalization involves a complete change of national character and termination of the prior allegiance * * *."

"Needless to say, naturalized citizens who resume residence in the foreign lands from which they came are apt to renew old associations and ways of living and thinking, and thus become merged in the native population, losing, to a great degree, if not completely, their American character and feeling. This makes it all the more desirable that their American nationality, and not merely their right to the diplomatic protection of this Government, should be terminated. Naturally, in these cases, identification with the native population is much more likely to occur than in the cases of naturalized citizens who reside in foreign countries other than those from which they came."

"For the reasons mentioned, Congress, in the provision of the second paragraph of section 2 of the act of March 2, 1907 (34 Stat. 1228) drew a clear distinction between native and naturalized citizens with reference to the effect of foreign residence upon the right to continued recognition and protection as citizens of the United States. The presumption of loss of citizenship, provided therein, as a result of protracted residence abroad, is expressly limited to naturalized citizens."

The report then described 13 cases as "illustrative of many presented to the Department of State in recent years, in which naturalized citizens of the United States who had resumed residence in their native lands called upon the Department for recognition and protection as citizens of the United States." Id. at p. 72.

The letter of the Committee transmitting its report and draft code to President Roosevelt included the following statement:

"Important reasons for terminating American nationality in cases of persons who reside in foreign countries and have to all intents and purposes abandoned the United States lie in the fact that it will prevent them from transmitting American nationality to their foreign-born children having little or no connection with the United States, and embroiling this Government in controversies which they may have with the governments of the foreign countries in which they reside." Id. at p. vii.

The letter also stated that none of the provisions in the draft code submitted by the committee were "designed to be punitive or to interfere with freedom of action" but were intended to deprive of citizenship those persons who had shown that "their real attachment is to the foreign country and not to the United States." Id. at p. vii.

After the President transmitted the report and draft code of the committee to Congress in 1938 the code was introduced as a bill in the House and extensive hearings were held by the House Com-

mittee on Immigration and Nationalization. Mr. Flournoy, Assistant Legal Adviser of the State Department, in commenting on the provision regarding naturalized citizens stated:

"We have every day in the State Department cases of persons applying to us for passports or protection, or asking us to support claims, who have been naturalized in the United States and then have gone back and settled down in their native countries and resided there for years." Id. at p. 134.

At the conclusion of the hearings in June 1940 a new bill was drawn up and introduced as H.R. 9980. Although there were changes from the draft code submitted by the President, the Nationality Act adopted in 1940 incorporated—as Section 404(b) the precise provision of the draft code for expatriating naturalized citizens who reside in their country of origin for three years. 54 Stat. 1170. Since then the provision has been incorporated into the Immigration and Nationality Act of 1952 as Section 352 (a) (1).

It seems plain from the background of Section 352(a) (1) that problems in the field of international relations gave rise to its enactment by Congress—problems attributable to naturalized citizens who take up residence for prolonged periods in the foreign country of their origin.

The question of the power of Congress to enact legislation depriving individuals of their American citizenship was first raised in the courts by Mackenzie v. Hare, 239 U.S. 299, 36 S.Ct. 106, 60 L.Ed. 297. The plaintiff in that case, Mrs. Mackenzie, a native-born American married a British subject permanently residing in this country. They continued after their marriage to reside here. There was then in force a statute [since repealed] providing: "That any American woman who marries a foreigner shall take the nationality of her husband." 34 Stat. 1228. Registration as a voter was denied Mrs. Mackenzie on the ground that she had ceased to be an American citizen. The question before the Supreme Court was: *"Did she cease to be a citizen by her marriage?"* 239 U.S. 299, 307, 36 S.Ct. 106. She had never intended or desired to give up her American citizenship. She challenged the constitutionality of the statute insisting that it was "beyond the authority of Congress" to take her citizenship away, and that her citizenship "was an incident to her birth in the United States, and, under the Constitution and laws of the United States, it became a right * * * which could not be taken away from her except as a punishment for crime or by her voluntary expatriation." The court upheld her expatriation, stating in part:

"As a government, the United States is invested with all the attributes of sovereignty. As it has the character of nationality it has the powers of nationality, especially those which concern its relations and intercourse with other countries. * * * It may be conceded that a change of citizenship cannot be arbitrarily imposed * * *. The law in controversy does not have that feature. It deals with a condition voluntarily entered into, with notice of the consequences. We concur with counsel that citizenship is of tangible worth, and we sympathize with plaintiff in her desire to retain it and in her earnest assertion of it. But there is involved more than personal considerations. As we have seen, the legislation was urged by conditions of national moment. * * * The marriage of an American woman with a foreigner * * * may involve national complications of like kind, as her physical expatriation may involve. Therefore, as long as the relation lasts it is made tantamount to expatriation. This is no arbitrary exercise of government. * * * It is the conception of the legislation under review that such an act may bring the Government into embarrassments and, it may be, into controversies."

Recent cases bearing on expatriation of a citizen without his consent include: Perez v. Brownell, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603, and Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630, decided in 1958; Kennedy v. Mendoza-Martinez and Rusk v. Cort, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644, decided in 1963. Each of these cases involved a man who had acquired United States citizenship by birth in this country, and had committed some act which a statute of the United States ordained should automatically terminate his American nationality.

In Perez v. Brownell, supra, the plaintiff, Perez, was born in Texas. He moved to Mexico with his parents when he was about ten years old. He entered the United States in each of the years 1943 and 1944 for temporary employment. At that time he was about 34 years of age and claimed to be a native-born citizen of Mexico. In 1946 he voted in Mexico in a political election. In 1952 he again entered the United States for employment. Following an order for his deportation in 1953 as an alien not in possession of a valid immigration visa, he brought suit for a judgment declaring him to be a national of the United States. Relief was denied on the ground that he had expatriated himself under a statute imposing loss of nationality upon a citizen for "voting in a political election in a foreign state * * *." 8 U.S.C. § 1481(a) (5).

The rationale of the Supreme Court in Perez was that the withdrawal of citizenship of Americans who vote in foreign political elections is reasonably calculated to effect the avoidance of embarrassment in the conduct of foreign relations and that Congress acted "pursuant to its power to regulate the relations of the United States with foreign countries" when it provided "that anyone who votes in a foreign election of significance politically in the life of another country shall lose his American citizenship." Accordingly the denationalization of Perez for such voting was sustained. Four members of the

court dissented, three on the ground that Congress lacks power to take away the citizenship of a native-born American. The fourth dissenter, although believing that Congress may expatriate a citizen for an act likely to embarrass the Government in the conduct of foreign affairs, deemed the statute "too broadly written to be sustained on that ground."

In Trop v. Dulles, supra, the alleged expatriating act was "deserting the military * * * forces of the United States in time of war" followed by conviction and dishonorable discharge. 8 U.S.C. § 1481(a) (8). In Kennedy v. Mendoza-Martinez and in Rusk v. Cort, supra, the alleged expatriating act was remaining outside the United States in time of war or during a period declared by the President to be a period of national emergency for the purpose of evading or avoiding training and service in the military or naval forces of the United States. 8 U.S.C. § 1481(a) (10). In each of these three cases the majority of the Supreme Court characterized the statute involved as punitive and held it unconstitutional, four members of the court dissenting on the ground that the statute resulted from the proper exercise by Congress of its war powers.

We turn now to the questions presented in this case, bearing in mind the diplomatic and legislative history already related as well as the Supreme Court decisions to which we have referred. The plaintiff says that Section 352(a) (1) bears no reasonable relation to any power granted to Congress. We believe, however, that the requisite rational relation exists between this statute and the power of Congress to deal with foreign affairs. Stated differently, we believe that the denationalization imposed by this provision is reasonably calculated to effect the end that is within the power of Congress to achieve —the avoidance of embarrassment and controversies in the relations of the United States with other countries. "The termination of citizenship terminates the problem." Perez v. Brownell, 356 U.S. 44, at 60, 78 S.Ct. 568, at 577.

 Now, we come to the contention of the plaintiff that the challenged statute is discriminatory and violative of due process in that it withdraws citizenship from naturalized Americans for continuous foreign residence while native-born Americans, without losing their citizenship, may reside abroad indefinitely. Like any other congressional enactment, a law passed by Congress in the exercise of its power to regulate foreign affairs must meet the requirement of due process. Kennedy v. Mendoza-Martinez, 372 U.S. 144 at 164, 83 S.Ct. 554, at 565. The due process guaranty of the Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, "demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." Nebbia v. New York, 291 U.S. 502, at 525, 54 S.Ct. 505, at 510, 78 L.Ed. 940.

 Due process does not require that all citizens be treated in the same way. Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774. Cafeteria and Restaurant Workers Union, Local 473, AFL–CIO v. McElroy, 367 U.S. 886 at 895, 81 S.Ct. 1743, at 1748, 6 L.Ed.2d 1230. In legislating within the scope of its powers, a lawmaking body has discretion in classification, and due process is not offended where the classification has a rational basis and is reasonably related to the legislative purpose. Under this concept, for example, the Supreme Court upheld in Mackenzie v. Hare, supra, a federal law divesting the citizenship of women but not of men marrying foreigners, and in West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, a state law for the setting of minimum wages for women even though the law did not extend to men. See also Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed. 2d 118.

The statute which the plaintiff challenges applies only to a particular class of naturalized citizens—those residing continuously for three years in the foreign country of their birth. It does not apply to other naturalized citizens nor to native-born citizens. By this statute the Congress recognized, on the basis of experience and history, that the problem of naturalized citizens residing at length in the country of their origin has far greater potential for causing international problems than foreign residence by citizens under other circumstances.

Stated differently, the application of the statute in question to foreign-born persons who become naturalized in the United States and return to reside for prolonged periods in the country of their origin is accounted for by the long history of friction between the United States and other nations relative to this particular class of naturalized citizens. The statute deals with them as the principal source of the problem of maintaining international relations in the face of demands for protection and similar relief.

 If a law presumably provides a remedy where it is most needed, it is not to be overthrown because there are other instances to which it might have been applied. West Coast Hotel Co. v. Parrish, supra, 300 U.S. at page 400, 57 S.Ct. at page 585.

 We think that Section 352(a) (1) satisfies the requirement of due process. It rests on a rational foundation, and has a substantial relation to the object which Congress sought to accomplish by its enactment.

 The remaining principal contention of the plaintiff is that the withdrawal of nationality under the challenged statute constitutes cruel and unusual punishment in a constitutional sense. Congress, in enacting this legislation, did not aim at punishment of the persons coming within its purview, but at lessening friction and controversies in our relations with other nations. In the light of these circumstances, it cannot fairly be said that the statute is

punitive in nature. Flemming v. Nestor, 363 U.S. 603, 613 et seq., 80 S.Ct. 1367, 4 L.Ed.2d 1435.

We touch now on some of the arguments urged upon us by the plaintiff in support of her main contentions.

As the plaintiff is not a dual national it is suggested that her foreign residence does not entail any problems incident to a dual nationality status. However, it is to be noted that in each of the two years following her marriage the plaintiff gave birth to a son in Germany who is now possessed of dual nationality, that is, the nationality of Germany and the nationality of the United States. International complications may reasonably be foreseen from such a situation since dual nationality "refers to the fact that two States make equal claim to the allegiance of an individual at the same time." Perkins v. Elg, 307 U.S. 325, at 344, 59 S.Ct. 884, at 894, 83 L.Ed. 1320. Moreover, dual nationality has long been a perennial source of friction between nations. Section 352(a) (1) having terminated the plaintiff's American citizenship in 1959, any child or children since or hereafter born to her in Germany would have the nationality of Germany but not that of the United States.

The Congress that passed the Nationality Act of 1940 (the statute that brought Section 352(a) (1) to its present form) was fully conscious of the problems incident to dual nationality. Among the reasons Congress had for terminating the American nationality of naturalized citizens taking up residence abroad is that such termination will prevent them from transmitting American nationality to their foreign born children and embroiling this government in controversies which they may have with the governments of the foreign countries in which they reside.[12]

According to the plaintiff, the upholding of the challenged statute "as a

proper exercise of the foreign affairs power would require a showing that the mere residence abroad of naturalized citizens in and of itself raises serious problems affecting the conduct of our foreign affairs * * * "[13] However, according to the Supreme Court in Borden's Farm Products Co. v. Ten Eyck, 297 U.S. 251, at 263, 56 S.Ct. 453, at 456, 80 L.Ed. 669:

"Judicial inquiry does not concern itself with the accuracy of the legislative finding, but only with the question whether it so lacks any reasonable basis as to be arbitrary."

The long recognized test is set forth in Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, at 209, 55 S.Ct. 187, at 191, 79 L.Ed. 281, by the then Chief Justice (Charles Evans Hughes) as follows:

"But that is a presumption of fact, of the existence of factual conditions supporting the legislation. As such, it is a rebuttable presumption. * * When the classification made by the legislature is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary."

Certainly in this case there has been shown a reasonably conceivable relation between the method chosen and the problem which Congress saw and sought to remedy under its foreign affairs power.

It has also been suggested that foreign residence by the plaintiff is a neutral act. However, settlement by a naturalized citizen in the foreign country of his nativity and the centering there of

---

12. 86 Cong.Rec. 11944, 11949. See also Nationality Laws of the United States, 1938, part 1, Committee Print, 76th Cong., 1st Sess., at p. vii.

13. Brief for Petitioner in the Supreme Court of the United States, Oct. Term 1962, No. 251, pp. 34–35.

all his primary interests, as the plaintiff has done, is conduct traditionally regarded by this government as evidence tending to show an intentional surrender of American citizenship or as importing some transfer of allegiance to the foreign country.[14]

Finally, the plaintiff insists that she is an American by training, in thought and in feeling, and that she values highly her American citizenship. But these sentiments, however sincere, were not conducive to her retention of residence in the United States. Nor is there anything in the record to show that since leaving this country she has performed any of the duties of American citizenship or that she ever intends to return to assume them. By voluntarily going to the foreign country of her birth and there continuously residing for three years, she has brought on her expatriation.

We conclude that the challenged statute must be upheld as a constitutional exercise by Congress of its power to regulate foreign affairs, and hence that the plaintiff is not a citizen of the United States. Accordingly the motion of the plaintiff for summary judgment will be denied, and the motion of the defendant for judgment on the pleadings will be granted.

CHARLES FAHY, Circuit Judge (dissenting).

It is apparent from the review of relevant legislation in the majority opinion that a strong case exists for holding that Congress reasonably concluded that a relation or nexus exists between the conduct of foreign affairs and residence abroad of some naturalized citizens. This I would not dispute. But when we consider whether the means adopted, and applied in this case, to further the conduct of foreign affairs meet the requirements of due process of law a more difficult problem is presented. Thus, such relation to or nexus with foreign affairs

(1) may exist with respect to some native-born citizens who reside abroad, and is not limited to naturalized citizens; (2) is not shown to exist in all cases of naturalized citizens whose residence abroad brings them within Section 352 (a) (1); (3) appears not to have been weighed by Congress in connection with the impact of Section 352(a) (1) upon the citizenship of one group of Americans vis-a-vis another; (4) is with respect to aspects of foreign affairs which are administrative and routine in nature rather than those ordinarily associated with the authority of the Executive and of Congress to conduct the foreign affairs of the nation; (5) is largely due to problems arising from dual nationality; (6) creates problems not shown to be incapable of reasonable solution by means less drastic than the total deprivation of nationality.

Conscious of the deference the courts must accord to the Acts of Congress, conscious also of the judicial obligation when the application of an Act to an individual deprives him or her of the priceless attribute of American citizenship, and renders him or her stateless, Trop v. Dulles, 356 U.S. 86, 103, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), and conscious further of the characterization by the Supreme Court of such deprivation in other circumstances as a cruel and unusual punishment, I conclude for the reasons now to be discussed that the application of Section 352(a) (1) so as to deprive plaintiff of her citizenship by operation of law would be inconsistent with due process of law.

Legislation seeking to terminate nationality has been considered by the Supreme Court in three recent cases. Perez v. Brownell, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958), Trop v. Dulles, supra, and Kennedy v. Mendoza-Martinez, and Rusk v. Cort, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). In Perez denationalization of a native-born was upheld under Section 401(e) of the Na-

14. H.R. Doc. No. 326, 59th Cong. 2d Sess., p. 27; 3 Moore, Digest of International Law, p. 739.

tionality Act of 1940, now part of Section 349 of the Act of 1952, 8 U.S.C. § 1481(a) (5), which provides for the loss of nationality by

> "voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory * * *."

A nexus was found between the power of Congress over the conduct of foreign affairs and "active participation, by way of voting, of American citizens in foreign political elections." 356 U.S. at 59 and 60, 78 S.Ct. at 576. It was said that withdrawal of citizenship was reasonably calculated to effect an end which Congress could lawfully achieve, namely, the avoidance of embarrassment in the conduct of our foreign relations. The Court added, however,

> "[T]he fact is not without significance that Congress [had] interpreted this conduct, not irrationally, as importing not only something less than complete and unswerving allegiance to the United States but also elements of an allegiance to another country in some measure, at least, inconsistent with American citizenship."

356 U.S. at 60–61, 78 S.Ct. at 577.

In Trop v. Dulles, supra, decided the same day, the Court held that a native-born American did not lose his citizenship and become a stateless person as a result of a court martial conviction for desertion followed by a dishonorable discharge. In so deciding the Court held Section 401(g) of the Nationality Act of 1940, as amended, to be unconstitutional.[1] The Chief Justice, joined by Mr. Justice Black, Mr. Justice Douglas and Mr. Justice Whittaker, while ac-

cepting Perez as upholding congressional authority to denationalize—contrary to their dissenting views in Perez—[2] as distinct from recognizing the right of voluntary expatriation, nevertheless concluded that to terminate Trop's nationality under Section 401(g) would be cruel and unusual punishment, violative of Article VIII of the Constitution. Mr. Justice Brennan joined in holding the Section unconstitutional. He pointed out that the conditions which led him to sustain denationalization in Perez were not met in Trop; there was not the requisite rational relation between Section 401(g) and the power relied upon by Congress to support the deprivation, namely, the power "to raise and maintain military forces to wage war."

In Kennedy v. Mendoza-Martinez, supra, which I shall refer to without separate mention of the companion Cort case, the Court held invalid Section 401 (j) of the Nationality Act of 1940, like § 349(a) (10) of the Act of 1952, 8 U.S.C. § 1481(a) (10), which sought to deprive an American of his nationality for departing from and remaining outside the jurisdiction of the United States in time of war for the purpose of evading military service. As in Trop the Court held that this was punishment for the proscribed conduct and, all else aside, could not be inflicted in a manner which did not comply with the procedural safeguards of the Bill of Rights, particularly those of the Fifth and Sixth Amendments.

In our own earlier case of Lapides v. Clark, 85 U.S.App.D.C. 101, 176 F.2d 619 (1949), denaturalization was upheld under the statutory provision: "A person who has become a national by naturalization shall lose his nationality by * * * (c) Residing continuously for

---

[1]. This Section provides that a person who is a national of the United States, whether by birth or nationality, shall lose his nationality by,

"deserting the military or naval forces of the United States in time of war, provided he is convicted thereof by court martial and as the result of such conviction is dismissed or dishonorably dis-

charged from the service of such military or naval forces * * *."
now embodied in the 1952 Act as 66 Stat. 267, 8 U.S.C. § 1481(a) (8).

[2]. Mr. Justice Whittaker, dissenting from the result reached in Perez, did not reach the constitutional question in that case.

five years in any other foreign state" with exceptions not applicable. Judge Edgerton dissented on the grounds (1) Congress may not discriminate against naturalized citizens and (2) arbitrary discrimination is not due process of law. He relied in part upon United States v. Wong Kim Ark, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890 (1898), and the opinion of Chief Justice Marshall in Osborn v. United States Bank, 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824). Citing Mackenzie v. Hare, 239 U.S. 299, 311, 36 S.Ct. 106, 60 L.Ed. 297 (1915), the opinion of the majority in Lapides referred to the implied power of Congress to provide for denationalization upon the basis of a classification which had a reasonable relation to a legitimate legislative end. The end sought was to lessen friction with foreign governments, and the legislation was also said to deal with a condition "voluntarily brought about by one's own acts, with notice of its consequences," for which reason it was said there was concurrence by the citizen in the loss of nationality. The intervening Supreme Court opinions, both majority and minority, in Perez, Trop and Mendoza-Martinez, do not rely upon a theory of concurrence, and so I do not accept the views in that regard expressed in Lapides. Voluntary residence abroad of a nationalized citizen for a longer period than is specified in Section 352(a) (1) does not constitute voluntary expatriation. Such residence does not deprive the national of the right to challenge the validity of the Section.

Coming now to the earlier Supreme Court case of Mackenzie, leaned upon in Lapides, it was there held that a statute which provided that "any American woman who marries a foreigner shall take the nationality of her husband"—a provision no longer in our statutes—involved the ancient principle of identity of husband and wife, then to some degree still adhered to. This permitted Congress to impute to the wife a kind of voluntary renunciation of citizenship or expatriation. Without attempting to explore the areas within which the law may treat the sexes differently—the power to do so consistently with due process is hardly deniable—it is noted that the Chief Justice, dissenting in Perez, pointed out that the effect of Mackenzie was only to hold in abeyance the citizenship of the American woman, rather than to terminate it. 356 U.S. at 69–73,[3] 78 S. Ct. at 581–584.

Savorgnan v. United States, 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287 (1950), was also relied upon in Lapides. There the native born American was found to have expatriated herself by applying for and obtaining naturalization as a citizen of Italy and by taking an oath of allegiance to the King of Italy. In thus expatriating herself she exercised a right long recognized by the United States and restated in Trop.

I come to consider the present case in light of the foregoing decisions, particularly those recently decided by the Supreme Court. In the first place the statute has about it something of the nature of legislative banishment. It applies only to a well defined group of citizens, who are subjected to a particular deprivation to follow automatically from conduct the statute proscribes, which takes no account of variations among individual cases. It appears to be an effort to regulate, although indirectly, conduct that occurs only in a foreign state, engaged in by persons whose presence there might be troublesome. Advised that it was difficult to prevent or remedy locally in the foreign states, through diplomatic

---

3. In his dissenting opinion in Mendoza-Martinez, in which Mr. Justice White joined, Mr. Justice Stewart stated: "This Court has never held that Congress' power to expatriate may be used unsparingly in every area in which it has general power to act. Our previous decisions upholding involuntary denationalization all involved conduct inconsistent with undiluted allegiance to this country." 372 U. S. at 214, 83 S.Ct. at 591. And it cannot fairly be said that the present case is of that character. In this connection it is of some significance that plaintiff is not a dual national.

channels, whatever the "difficulty and embarrassment" might be, and eschewing other possible remedies should embarrassment in fact occur, Congress was persuaded to legislate a process which cuts off the offending citizen from the American body politic.[4] The majority opinion refers to the statement in Perez that this terminates the problem by terminating citizenship. Such a remedy for the problem posed by the Executive in 1938 and involved in the present case, though not in Perez, raises constitutional questions which are not answered by pointing to the administrative convenience to be achieved in this manner, the principal basis which was advanced for the remedy.[5] President Truman's Commission on Immigration and Naturalization in 1953 said the following about the denaturalization provisions here involved:

By attaching strings to a naturalization order, they create a body of

citizens unable to do, except on penalty, what other citizens may do.

Secondly they undo a judicial determination without the benefit of court action. * * * Judgments in naturalization should [like other court decrees] be vested with finality. If fraud in obtaining naturalization is suspected, a judicial proceeding to set aside the judgment is necessary. The loss of naturalized citizenship by reason of mere residence abroad should not result from legislative fiat.

"Whom We Shall Welcome," Report of the President's Commission on Immigration and Naturalization 239–40 (1953). I do not say, however, that denationalization under Section 352(a) (1) is punishment; it does not appear that Congress intended by this Section to effect "retribution and deterrence," though the provision points in that direction.[6]

4. It seems fairly clear from the discussion centering upon the 13 illustrative cases cited in support of Section 352(a) when it came before Congress in 1938, that what was sought to be avoided was the necessity in each case to decide—either administratively or judicially—whether an individual had abandoned his American citizenship by continued residence in the land of his birth or prior nationality. These illustrative cases do not disclose what disputes arose, if any, between the Government of the United States and the foreign governments in connection with the various individual claims for passports, registration, or presentation of claims. Rather the fact merely of foreign residence for various periods and under such circumstances as were said to indicate no present intention to resume United States residence seems to be the embarrassing element in these cases. See Nationality Laws of the United States, House Committee Print, Part I, pp. 72–76 (1938).

5. See note 4, supra. The problem seems to have been one of the Government's unwillingness to process legitimate claims of a citizen like presentation of a claim against the host state or issuance of a passport. In some of the cases cited the person involved had served in a foreign army, but this is separately dealt with under the 1940 legislation. Furthermore

questions of re-naturalization by another state were present, sometimes with an indication that it may have been involuntarily imposed. In this connection the statement of Secretary of State Bayard, in regard to such a situation vis-a-vis Mexico in 1886, should be recalled:
"The United States, while claiming for aliens within its jurisdiction, and freely conceding to its citizens in other jurisdictions the right of expatriation, has always maintained that the transfer of allegiance must be by a distinctly voluntary act, and that the loss of citizenship cannot be imposed as a penalty nor a new national statute forced as a favor by one Government upon a citizen of another." U.S. For. Rel., 1886, 723.

6. See Mendoza-Martinez, supra, 372 U.S. at 168, 83 S.Ct. at 567, where some of the indicia of legislative punishment are discussed. Punishment is judicially regarded as the *sine qua non* of a bill of attainder. See United States v. Lovett, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). And the element of past conduct, or an ex post facto flavor, if it be required, may be lacking for a determination that this Act constitutes such a bill. However that may be, the quality of punishment insofar as the due process of the Fifth Amendment and the rights guaranteed by the Sixth Amendment are concerned, is not entirely absent here.

Another aspect of the problem is noted preliminarily to enlargement upon the view that the statute violates the Fifth Amendment in its discrimination against naturalized citizens, the chief basis for my dissent. It is by no means clear that deprivation of citizenship for foreign residence is a proper exercise of the foreign relations power in the case of this plaintiff, aside from its discriminatory feature. The premise stated by Mr. Justice Frankfurter in Perez, supra, to sustain the loss of citizenship where the individual had voted in a foreign election, should not be read as holding that such a power sweeps all before it. Voting has traditionally been considered one way a person indicates his political allegiance. And our earliest statute on denationalization had to do primarily with codifying the ways by which it could be objectively determined that a citizen had exercised his right voluntarily to expatriate himself.[7] It does not follow that any governmental action connected in some way with foreign relations can be judicially approved notwithstanding the Bill of Rights. And our constitutional authority is not defined by reference to the sovereign powers of other nations. For ours is a limited government, deliberately so designed with certain rights guaranteed against invasion by the Government.

The right to a nationality is a fundamental one. Our Government has approved the provisions to that effect in the Universal Declaration of Human Rights, Art. 15. Of course under principles of international law a state may decide for itself what criteria must be met in order that citizenship may be achieved. See United States v. Schwimmer, 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889 (1929); Briggs, The Law of Nations 459–62 (1952). And the United States is not bound by a treaty on the subject. A Covenant was to follow the Declaration of Human Rights but has not been entered into. Nevertheless it will no doubt be generally acknowledged that persons may not arbitrarily be deprived of their nationality, an attribute essential to the full possession of personal dignity. Especially is this so when statelessness results from denationalization.

"In recent times statelessness has become a serious problem. It is an anomaly in the international legal order. A stateless person does not enjoy the protection of any state and is often excluded from many rights and privileges in the state where he resides."

"The Universal Declaration of Human Rights, A Standard of Achievement" 8 (U.N.Publ.No. 62.1.9, 2d ed.). See also

7. "In the early days of the country, the United States was the international champion of every individual's right to expatriate himself. In 1868, Congress declared by statute that the right of expatriation is a natural and inherent right of all people. We were then welcoming and seeking immigrants from the Old World and the refusal of European rulers to recognize American naturalization of its former subjects was a matter of concern to us.

"But although the United States recognized and espoused the inherent right of all persons to expatriate themselves, our own laws were silent as to what actions by our citizenry would result in voluntary expatriation or involuntary forfeiture of citizenship. The courts and administrative officers solved such issues as they arose. In 1907, Congress declared that any American citizen shall be deemed to have expatriated himself when he has been naturalized in a foreign state or has taken an oath of allegiance to any foreign state. Except for statutes providing for loss of the rights of citizenship in time of war by deserters or draft evaders, the law remained unchanged until the enactment of the Nationality Act of 1940."

"Whom We Shall Admit," supra, at 242. The President's Commission in conclusion recommended that only a presumption of loss of citizenship should be created by a three year residence in the land of one's birth. Id. at 240. Interestingly enough the courts under the 1907 statute took the view that the presumption related to loss of diplomatic protection and not citizenship itself, a view which has been credited to Attorney General Wickersham in an opinion of 1910. Nationality Laws of the United States, supra, at 70.

the Court's opinion in Mendoza-Martinez, supra, 372 U.S. at 160–161,[8] 83 S.Ct. at 563–564. The accepted idea in our nation in the 19th Century that a person may flee one country and cleave to another—if he chooses—is a long way from the notion that a citizen who leaves this country to take up for a term of years residence in a country with which he has had past association has thereby (a) manifested an intention to assume another nationality, or (b) indicated a desire to be rid of the responsibilities of American citizenship, or (c) assumed a status so awkward for the United States Government that his intentions are not relevant and national policy requires the general severance of the ties of citizenship of all those coming within the category described in Section 352 (a) (1). The first two alternatives are obviously arbitrary in the absence of a determination on a case by case basis, and the third, which more nearly represents the position of the Government, would seem to call for justification under the foreign relations power by some more urgent public necessity than substituting administrative convenience for the individual right of which the citizen is deprived.

In the end, however, the basis for my dissent is that the statute is violative of due process of law in that it unfairly discriminates against the naturalized citizen. Due process requires the "equal protection of the laws," terms appearing in the Fourteenth Amendment applicable to the states, but applicable also to the Federal Government by reason of the Due Process Clause of the Fifth Amendment. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The provision for termination of the nationality of a naturalized citizen because of three years continuous residence in the territory of a foreign state of which he was formerly a national, or in which his birthplace is situated, cannot apply to a native-born citizen. By definition the latter does not acquire his citizenship by naturalization. The inequality in treatment is apparent. The statute as applied to plaintiff imposes upon her the serious consequence of loss of nationality due to foreign residence whereas a national born on American soil may reside abroad indefinitely, and for any reason, without such loss.[9]

The Constitution, however, does not require the law to treat all persons alike. Differences due to reasonable classifications may be valid. This has been recognized with respect to age, sex, occupation. and other factors. The question remains, however, whether this principle can justify taking away the nationality of one national for reasons not made applicable to another national, and, if so, whether the basis asserted for doing so justifies such a severe inequality imposed by law.

The present classification is not based on voting in a foreign political election, as in Perez, or on taking an oath of allegiance to a foreign state, as in Savorgnan. It is based on place of birth and residence. The inequality in treatment arises after American nationality has been conferred. This is contrary to the general policy of our laws to maintain equality in the status of citizens. A difference which antedates naturalization may not readily be revived after citizenship is acquired and by such revival create a more vulnerable type of citizenship than is possessed by the native-born. Whatever exceptions might be recognized the decided trend of law is to consider the naturalized citizen like the native-born. There is the exception that the President must be native-born

8. Earlier legislation seems to reflect these principles. See note 7, supra.

9. We note the special demand made on a person who acquires a dual nationality at birth—by place of birth or by parentage—and who after age 22 resides in the state other than the United States for three years. Under certain conditions he must take an oath of allegiance to the United States during the period of three years. 8 U.S.C. § 1482. Cf. Mandoli v. Acheson, 344 U.S. 133, 73 S.Ct. 135, 97 L.Ed. 146 (1952).

because in this respect the Constitution adopted at the beginning of the Republic so provides.

Let us assume, however, that Congress has authority to draw distinctions between the native-born and the naturalized and to classify for some difference in treatment the naturalized citizen who leaves the United States to live in the country of his birth. Let us assume, in other words, that there is a reasonable basis for Congress to conclude that such a person is more likely than the native-born to embarrass the United States in the conduct of foreign affairs, though both live in the same foreign state for the same length of time and one bears no greater allegiance to the United States than the other. Whether a law under which only the naturalized national entirely loses his nationality by such residence is consistent with due process of law requires a decision whether the adoption of such severe inequality of treatment as a means to the end sought by Congress in decreeing it is reasonable in a legal sense when all its consequences are considered. See Mr. Justice Stewart's dissent in Mendoza-Martinez, in which Mr. Justice White concurred, 372 U.S. at 214, 83 S.Ct. at 591, where it is said in reference to Trop that it was there emphasized "that the harshness of denationalization for conduct so potentially equivocal was 'an important consideration where the asserted power to expatriate has only a slight or tenous relationship to the granted power'" quoting the concurring opinion of Mr. Justice Brennan in Trop, 356 U.S. at 110, 78 S.Ct. at 603.

As to the harshness of the deprivation and its consequent inequality we need not dwell upon the many references in Supreme Court opinions to the preciousness

of American nationality, and the cruel and unusual character of a law which terminates it. Moreover, in the present case, there is a complete absence of conduct hurtful to the United States in plaintiff living with her husband at the place of his work and residence in a foreign state.[10] That the place is also in the state of her birth is fortuitous. She did not seek to live there, but rather as a young American she met and married a man who makes his living there. She is not a draft evader or a deserter or one who votes in a foreign political election or swears allegiance to a foreign state. Yet she is put to the choice of abandoning either her husband or her nationality. No comparable choice is required of a national born on American soil who lives abroad in like circumstances.

It is not suggested that she has been a source of embarrassment in the conduct of our foreign affairs; the statute covers her situation because it applies across the board, as it were, to all foreign born. On the other hand a national born in America may safely carry his nationality abroad without fear of losing it even if his presence proves diplomatically embarrassing in the extreme—provided of course he does not engage in conduct specifically proscribed, such as voting in a foreign political election.[11] A total loss of nationality occurs in the case of one with no deprivation at all in the case of the other. An inequality of treatment of so severe a character, made on an uncertain basis for any actual difference in the effect of residence of one in comparison with residence of the other on the conduct of foreign affairs, does not meet the test of reasonableness in the means adopted for accomplishing the legislative purpose. A reasonable classification for

10. In this regard the majority opinion seems to take a different view: "But these sentiments [of wishing to remain an American], however sincere, were not conducive to her retention of residence in the United States." But Congress has not indicated in the legislation under consideration that its purpose was to keep Americans at home, but rather to promote the smooth working of our foreign relations. Furthermore, we must not confuse the problem in this case with the problem of fraudulent acquisition of citizenship, separately dealt with under the 1940 legislation.

11. But see note 9, supra.

some purposes does not justify the law in imposing an inequality among citizens out of proportion to the purpose for which the classification is made. See, again, Trop, 356 U.S. at 110 and 114, 78 S.Ct. at 603 and 605 (concurring opinion), and our reference above to the dissenting opinion of Mr. Justice Stewart in Mendoza-Martinez. Though I assume denationalization in plaintiff's case possibly would tend to avoid some possible embarrassment in the conduct of foreign affairs it is not shown that the embarrassment would be either certain or substantial, and in any event the assumption that denationalization avoids some embarrassment incident to residence abroad applies to the native-born as well as to the naturalized national.[12] See Worthy v. Herter, 106 U.S.App.D.C. 153, 270 F.2d 905 (1959), cert. denied, 361 U.S. 918, 80 S.Ct. 255, 4 L.Ed.2d 186 (1959). The difference in degree of embarrassment, if any, is not shown to be substantial enough to warrant so great a difference in the consequence meted out only to the naturalized citizen. Constitutional power should not be over-extended so as to deprive plaintiff of a fundamental liberty upon so tenuous a basis.

Perhaps the matter can be stated more simply. The Supreme Court has held in the case of a convicted deserter that denationalization is a punishment so cruel and unusual as to violate the Eighth Amendment. The Court has also held in the case of one who leaves and remains outside the jurisdiction of the United States in time of war for the purpose of evading military service that denationalization is a punishment which, if to be upheld at all, must be accompanied by the safeguards of procedural due process of law. It would seem necessarily to follow from these decisions that in the case of the plaintiff denationalization, which is just as severe as in the two cases referred to, would create such a serious

inequality among Americans upon so tenuous a basis that it fails the test of reasonableness which substantive due process requires of all legislation, especially that which restricts the liberty of the citizen.[13] What is cruel and unusual under the Eighth Amendment for the deserter *a fortiori* is unreasonable in its solitary application to a naturalized citizen under the Due Process Clause of the Fifth Amendment. Indeed, were there no Eight Amendment it is probable the conclusion reached in Trop and Mendoza-Martinez would rest equally well upon the Due Process Clause alone.

I would grant plaintiff's motion for summary judgment.

12. See notes 4 and 5, supra.

13. We are not concerned here with the greater latitude by which the reasonableness of legislation concerning economic problems is to be judged, but with the stricter test applicable to a deprivation of personal liberty.